Argued October 12, reversed and decree entered November 30, 1920, rehearing denied March 1, 1921.

# DOUGAN CO. *v.* KLAMATH COUNTY.

(193 Pac. 645.)

**Counties—County Court has Authority to Contract for Courthouse.**

1. Under Section 937, L. O. L., the County Court has authority to contract for the building of a courthouse, subject only to the limitation as to indebtedness prescribed by the Constitution.

**Counties—Contract of County Court for Courthouse Reviewable by Court Only for Illegality or Fraud.**

2. The act of the County Court, as fiscal agent for the county, in contracting for the building of a courthouse, can be disturbed by a court only for illegality or fraud.

**Counties—No Fraud Shown in Contract of County Court for Courthouse.**

3. Evidence *held* to show no fraud of a County Court in contracting for building of a courthouse, the circumstances allowing of an honest difference of opinion as to whether it should be built or another completed.

**Counties—Contract for Courthouse not Terminated, Notice by County Court not Being Served.**

4. There being outside of the journal entry of a County Court, to the effect that a contractor for building a courthouse should cease work on the contract, and that the county would not be responsible for the purchase of any more material, no evidence that it was ever served on the contractor, or that he ever had any personal knowledge of it, it would not have any legal effect to terminate the contract.

**Counties—Contractor for Courthouse not Required to Quit Valid Contract and Sue for Damages on Notice of Cancellation.**

5. A contractor having a valid contract with a county for construction of a courthouse, payable out of a special courthouse fund, need not cease work and sue for damages where, after partly performing the contract and making expenditures and incurring liabilities thereon, he receives notice from the county that the contract is null and void for specified reasons and therefore canceled; a judgment for the breach not being payable out of the special fund, and the county not having other funds and having reached its limit of indebtedness.

**Counties—Valid Contract for Courthouse not Terminated by Notice from County Court That It is Invalid and Canceled.**

6. A valid contract with a county for construction of a courthouse is not terminated by a notice from the county, not recognizing that the contract ever had validity, but declaring it null and void for specified reasons, and therefore canceled.

Counties—Contract for Courthouse Construed as Made With Reference to Special Courthouse Fund.

7. A contract with a county for construction of a courthouse, containing no provision as to the source of payment, is to be construed as made with reference to a special courthouse fund, from which only payment could be made.

Counties — Funds from Levy for New Courthouse Construction Available for Subsequent Contract.

8. Where, for several years, when a county had an uncompleted courthouse, the published budgets, under Budget Law, provided simply for a levy for "new courthouse construction," and levy was so made, the money so collected and allowed to accumulate was available for another courthouse thereafter contracted for by the county.

Counties — Levy for New Courthouse Construed With Published Budget for Courthouse on a Certain Lot.

9. A levy, though made simply for "new courthouse construction," is to be construed with the corresponding published budget providing for a levy for completion of courthouse on a certain block, so that the taxes raised thereby are not available for payment of a courthouse on another block, contract for which had theretofore been made.

Counties—Contract for Courthouse Held Legally Entered into.

10. Contract for a courthouse *held* legally entered into, all the proceedings therefor having been at a regular or adjourned meeting of the County Court, held in the county courtroom, in which all the members participated, the contract being awarded and signed by a majority of the members.

Counties—Special Courthouse Construction Fund not to be Used for Protection and Preservation of Another Courthouse.

11. No part of a special courthouse fund, with reference to which as the source of payment a contract was made with the county for construction of a courthouse, should be used for protection and preservation of another uncompleted courthouse, but payment for such care should be from a subsequent levy for the use of that building.

Counties—Fees of County's Attorneys Defending Suit for Payment for Courthouse not Payable from Courthouse Fund.

12. Fees for attorneys for the county in a suit against it for payment for construction of a courthouse should not be paid from the special courthouse construction fund.

Counties—Costs of Plaintiff in Suit for Payment by County for Courthouse Payable Out of County's General Fund.

13. Costs and disbursements awarded plaintiff seeking to enforce payment by a county out of a special courthouse fund for construction of a courthouse are a claim against the county payable out of its general fund.

13. On question of liability of county for costs, see note in Ann. Cas. 1914B, 892.

From Klamath: James W. Hamilton, Judge.

In Banc.

The plaintiff is a contracting firm which we will hereafter name as "Dougan." The defendant Klamath County is a legal subdivision of . the state of which R. H. Bunnell is now County Judge, and Burrell Short and Asa Fordyce are Commissioners, the three constituing the County Court. De Lap is the County Clerk, and Van Riper its Treasurer. The defendant Marion Hanks was formerly County Judge, and the defendant McCornack a commissioner. The defendant John Koontz is the sole plaintiff in a suit to enjoin the county from the erection of a courthouse on Block 35. Charles Loomis is the sole plaintiff in a suit to enjoin the county from using the special courthouse fund in the completion of the building on Block 10, and E. E. McClaran is the superintending architect who was employed by the county.

In 1887, Quincy A. Brooks, et al., conveyed to the defendant county what is known as Block 35, with a stipulation in the deed as to an undivided one-half interest that—

"Said county shall in five years from this date erect upon said premises a suitable courthouse, and thereafter keep and maintain said courthouse on said premises."

A courthouse was constructed thereon, and ever since has been used for such purposes.

In 1909, the County Court decided that a new courthouse should be built, and for that purpose made special levies for the years 1909, 1910, and 1911. In the making of such levies, nothing was said as to where it should be constructed. On June 30, 1911, the Klamath County Development Company executed

a deed to the defendant county for Block 10 in Hot Springs Addition to Klamath Falls, conditioned that within five years from date the county would construct, and thereafter maintain, a courthouse upon that block. The conveyance contained the following recital:

"The failure on the part of the party of the second part (the county) to comply with the foregoing conditions shall render this conveyance null and void, and said property shall revert to the party of the first part (Klamath Development Company)."

The county then commenced the construction of a courthouse on Block 10, under plans and specifications prepared by Architect McDougall, under the direction of a foreman and without a general contractor, and no contract was ever let for the construction of that building.

County levies were made for the years 1913 and 1914, in each of which it was specifically provided that the levy was made for the purpose of constructing the courthouse on Block 10 in Hot Springs Addition. All of the money derived therefrom was expended in the construction of a building on that block, but that courthouse was never finished, and a large amount of money was required for its completion, estimated at from $120,000 to $200,000. On December 3, 1915, the county Court of Klamath County made another levy of a special tax amounting to $60,000 for "new courthouse construction" and "to be used in the construction of a new courthouse." In 1916 a like levy of $50,000 was made, in 1917 a similar levy for $60,000, the last three of which followed the Budget. In December, 1918, another levy for $20,000 was made "for the construction of a new courthouse," which did not follow the Budget, as

will hereafter appear. Notwithstanding such levies, no work has been done in the construction of that courthouse since the year 1914. In November, 1917, the County Court as it was then constituted employed three reputable architects—E. E. McClaran and R. E. Cushman, of Portland, and A. F. Heide, of San Francisco—to make an examination of the unfinished courthouse on Block 10 and estimate the cost of its completion. McClaran reported that according to the original McDougall plans, it would cost $210,000, and that by making certain changes the building could be completed for $120,000. Heide's estimate under the original plans was $138,096.39, or $126,165.63 if changes in the plans were made. Cushman estimated the cost at $193,140. Both McClaran and Cushman stated that it would require an additional $30,000 for improvement of the grounds. Each made written reports as to the physical condition of the unfinished structure. On January 25, 1918, after consideration of the reports and estimates, the county employed the defendant E. E. McClaran and Houghtaling & Dougan to "make, execute, and design plans and specifications for a courthouse, work done for Klamath County, Oregon, to be located in Klamath Falls, Oregon," and to supervise the construction of the building. They then prepared plans for the completion of the courthouse on Block 10, in which, for the purpose of reducing the cost, the original plans of McDougall were modified as directed by the County Court. Such alterations were approved by all members of the County Court. Plans were also submitted for an entirely new building on Block 35, patterned after the courthouse recently built in Josephine County.

On February 21, 1918, the County Court convened for the purpose of hearing the reports of the architects, and it was then decided that it would be "for the best interest of the people and taxpayers of the county to call for bids for the completion of the present new courthouse and for the construction of an entirely new building according to the plans at this time submitted." The County Court. ordered that the clerk prepare and publish a notice to contractors to submit bids for the completion of the structure on Block 10, and for a new building on Block 35, in order that the court may be informed as to the best course to pursue, "taking into consideration the best interest of the county." Bids were to be submitted not later than March 20, 1918, and the construction was to be in accord with the plans then on file with the clerk. Notice was duly published in the "Evening Herald" of Klamath Falls and the "Daily Record-Abstract" of Portland. As a result of agitation and discussion growing out of such proceedings, on March 8, 1918, a meeting of the County Court was held, of which the journal entry recites:

"If it is to the general interests to complete the building in the Hot Springs Addition we shall do that, but if we find it much more economical to build entirely new we shall proceed along that line. ·

"We have been making a thorough investigation of this whole matter. We have employed architects of wide reputation for both character and ability, and shall consider both their reports as subscribed and sworn to and the bids that may came before us. We have advertised for these bids in both the official county paper and a Portland paper especially designed to reach contractors and builders.

"We want to emphasize the point that after we had the reports of the architects before us the court went over the whole matter of completing the build-

ing in the Hot Springs Addition, and we agreed, unanimously on the details of completion in case that proved advisable, and we all signed a statement approving the plans and specifications upon which we have called for bids upon this work. We want to assure you that we have the best interests of the county at heart, and shall proceed without fear or favor, as the best interests of the county shall require.

" * * We must know what we are doing before we proceed with an undertaking of such magnitude."

On March 20, 1918, another meeting of the court was held, at which five different bids on each courthouse were received and opened, the highest of which, for the completion of the building on Block 10 was $191,000, and the lowest the bid of Dougan for $181,-546. The highest bid for the construction of the building on Block 35 was $138,000, and the lowest Dougan's, for $131,775. At this meeting Commissioner Short moved that none of the bids be accepted, but the motion was lost, and the defendants Marion Hanks, County Judge, and F. H. McCornack, Commissioner, then entered into a written contract with Dougan for the construction of the building on Block 35 for the amount of his bid. By the terms of his contract, Dougan agreed to construct the courthouse in accord with the plans and specifications, and "to the satisfaction of and under the direction of a superintendent." Payments thereon were to be made "on certificate of superintendent as the work progresses, 90 per cent of the estimated value of the same and material furnished and labor performed, and 50 per cent of the remaining amount within ten days after the faithful completion and acceptance of all of the work." The contract recites:

"It is further agreed that, in case any difference of opinion shall arise between said parties in relation

to the contract, the work to be performed under it, or in relation to the plans, drawings, or specifications, hereunto attached, the decision of the architect shall be final and binding on all parties hereunder.''

It was also agreed that an umpire might be chosen by consent of the parties and that his decision should be final.   In consideration thereof, the defendant county agreed to pay Dougan $131,775 ''on certificate of superintendent as the work progresses.''   As a part of the contract, Dougan furnished a bond in the sum of $65,887.50 with the Aetna Casualty and Surety Company as surety, which was approved March 26, 1918.   He then entered upon the construction of the building.

Before submitting his bids Dougan had obtained prices for material to be used in construction, and, based thereon, had entered into tentative contracts conditioned that, should he be awarded the contract, upon its signing he would wire his acceptances of material contracts.   The evidence shows that when his contract with the county was signed he promptly wired such acceptances, and that the other parties promptly entered upon the performance of their respective contracts, by which he became personally liable in an amount ranging from $60,000 to $90,000.

On April 20, 1918, Dougan received from E. E. McClaran, the superintendent and architect in charge of construction, three certificates: One for $16,200, dated April 17th; one for $15,196, dated April 18th; and the other for $10,152 of the latter date.   These certificates were approved by a majority of the County Court, and on April 20th warrants therefor were drawn upon, and paid out of, the special courthouse fund.

As the result of a recall, on April 22, 1918, Bunnell succeeded defendant Marion Hanks as County Judge. On April 27th, the following entry was made in the record *in re* Dougan contract:

"The court at this time served verbal notice on J. M. Dougan and his attorney, C. F. Stone, to cease work on such contract and that the county would not be responsible for the purchase of any more material."

It further appears that on May 2, 1918, the following proceedings were had:

"RESOLUTION.

"In the matter of the annulment of the alleged contract of March 20 between Klamath County Court and J. M. Dougan & Co.

"This matter coming on at this time to be heard upon the motion of Burrell Short, County Commissioner, for the consideration of the revocation or affirmation of the alleged contract heretofore attempted to be entered into by and between the county court of Klamath County, Oregon, and J. M. Dougan & Co.; regularly to be heard; and

"It appearing from the records and files of Klamath County, in the office of the County Clerk and the records of the County Treasurer, and it also appearing that injunction proceedings were pending in the Circuit Court by a taxpayer of Klamath County, against Marion Hanks as County Judge, and Burrell Short and Frank McCornack as County Commissioners, and that due and legal service of said proceedings were made upon said county court enjoining the expenditure of the funds of Klamath County for the construction of any courthouse building on said Block 35 at the time of the signing and filing of the so-called contract between the county court and J. M. Dougan & Co. for the erection of said building;

"And it further appearing to the satisfaction of this court that said contract was entered into at a

meeting of the County Judge and County Commissioners contrary to Sections 940 and 925 of Lord's Oregon Laws;

"And it satisfactorily appearing to the court that there were no available funds for the construction of said proposed building, and that said proceedings of the county court were wholly null and void:

"THEREFORE IT IS HEREBY ORDERED that said contract be, and the same is hereby, canceled, and the sheriff of Klamath County is hereby directed to serve a certified copy of the foregoing Order upon J. M. Dougan & Co.

"Dated at Klamath Falls, Oregon, this 2d day of May, 1918.

> "(Signed) R. H. BUNNELL,
> "County Judge,
> "BURRELL SHORT,
> "County Commissioner."

On that date, Mr. Stone, as attorney for Dougan, duly accepted service of the order, and four days later a certified copy was served on Dougan by the sheriff of Klamath County, by delivery to P. J. Crowley, superintendent of construction.

At another meeting held on May 14th, after reciting that the money paid to Dougan was for an illegal claim against the county, and that it was wrongfully and unlawfully obtained, not having been authorized or allowed at any regular session, the County Court directed the district attorney forthwith to commence an action against Dougan and others "for the recovery of said money so wrongfully abstracted from the treasury of Klamath County." A copy of this order was also served. Pursuant to such instructions, and based thereon, the action was promptly commenced to recover the $41,548 which had been paid on the contract. Dougan ignored the notice and action, and continued the construction of the building.

On February 27, 1919, the superintending architect issued his final certificate to the effect that Dougan had completed the courthouse according to the terms and conditions of the contract, and that the amount then due thereon, including certain extras, was $92,-674.95. The defendant county refused to pay, and Dougan brought this suit to recover that amount, in which all of the facts are alleged, and copies of all the material records and proceedings of the county, including the contract, are attached to and made a part of the complaint. The prayer is for a decree against the defendant county and its officers, restraining them from issuing any county warrant on the special courthouse fund, except in payment of the architect's said certificates; from the appropriation of any portion of the money for any purpose other than such payment; also for an adjudication that plaintiff's contract is valid and binding between the parties; that the county be required to accept the courthouse, and pay the full amount of the claim evidenced by the certificates of the architect out of the special courthouse fund; and for such other and further relief as may be just and equitable.

The defendants filed a joint answer in which they admit that on or about January 25, 1918, the county undertook to enter into a written contract with the architects as alleged in the complaint, and that certain bids were submitted for the completion of the courthouse on Block 10, and for the construction of a new courthouse on Block 35. It is also admitted that the county judge and one of the county commissioners signed a written contract with Dougan in form substantially as alleged in the complaint. The defendants allege that these officers had no authority to enter into any contract for the construction of a

courthouse on Block 35; that "at the time they pretended to meet and consider said matter they were not assembled in any regular session of the County Court called by law, nor in special nor adjourned session thereof, as provided by the laws of this state"; and that "said matter was never considered by the said County Court of said county in lawful session assembled, nor had any fund ever been created or levies made for any such purpose." It is admitted that—

"Thereafter plaintiff went upon said Block Thirty-five (35) and commenced the construction of a building thereon, and that in doing so expended certain sums of money, but these defendants have no knowledge or information as to the extent of such expenditure";

—and that the plaintiff has received the sum of $41,548 paid on the certificates of the superintending architect out of the "courthouse fund." The defendants then allege that such certificates were false as to the amount earned for the labor and material furnished, and that at such time the gross amount of plaintiff's claim would not exceed $2,000. It is admitted that—

"Klamath County, at the times mentioned in the said complaint, was indebted in excess of the sum of $150,000, and that no portion of said indebtedness was created for the purpose of suppressing insurrection or repelling invasion, and at said times said county was and is now indebted in excess of all revenues payable to or collectible by the county, and that for said indebtedness there are outstanding and unpaid county warrants to the amount of said indebtedness";

and that—

"Certain labor was performed and material was furnished by plaintiffs towards constructing a build-

ing on Block Thirty-five (35), Klamath Falls, Oregon, and that said E. E. McClaran signed certain instruments designated certificates purporting to be for work done and material furnished on said building, and that the amount of money called for by said instruments is substantially as alleged in said paragraph.''

The answer further admits ''that the County Court of said county declined and refused to pay any money to Dougan after said sum of $41,548 was wrongfully and unlawfully abstracted from the treasury of said county and turned over to him,'' and that the superintending architect issued his final certificate of completion from which it appeared that there was the sum of $92,674.95 due on the contract, but it is denied that there was any money due Dougan, or that there was ever any fund created or levy made for any payment to him. It is also admitted that—

''Plaintiffs have offered to turn over to Klamath County the structure which they unlawfully started to build on Block thirty-five (35), and that said county refused to receive said structure, and that these defendants have at all times claimed, and still claim, that said pretended agreement between said county and the plaintiffs is null and void and that the county is not bound by it.''

The answer admits that an action was commenced by the County Court against Dougan et al., to recover the $41,548 alleged to have been abstracted wrongfully and unlawfully from the treasury of the county, and avers that it is sought to recover the money upon the claim that the pretended contract with Dougan ''is illegal and void, and that the special courthouse fund was not available for the purpose of satisfying any pretended claim or demand of plaintiff against said county of Klamath.'' A general

denial is made of all other material allegations of the complaint.

As a first further and separate defense, it is alleged, in substance, that as a result of the 1909 levy for ''a special courthouse fund'' there was deposited in the treasury of Klamath County $13,-128.63; for the year 1910, $28,048.79; for 1911, $21,-461.84; for 1913, $53,137.97; for 1914, $57,982.65; for 1915, $60,497.63; for 1916, $80,000; and for 1917, $60,000; that all of such levies were made during all of said years for the building and completion of a courthouse on Block 10; that on March 20, 1918, there was in such fund the sum of $124,149.04 and no more; that the whole amount thereof is now required and necessary for the completion of the courthouse on Block 10; that all of such taxes were specially levied, assessed, and collected for the purpose of constructing and completing the courthouse on Block 10; and ''that no special fund was ever created by any County Court of Klamath County during all the years herein mentioned, for the erection of a new courthouse on Block 35 of the City of Klamath Falls, and no money was ever levied, assessed or collected for such purpose.'' The defendants further allege:

''That there were no funds, actual or potential, in the hands of the treasurer of Klamath County, for the employment of E. E. McClaran, or any other person or persons, either as architect or superintendent, or as agent in any other capacity, for the construction of any courthouse building, or any building on Block 35 of the City of Klamath Falls'';

—and that, as soon as the taxpayers of the county knew that the County Court was considering the erection of another courthouse, about eleven hundred of

99 Or.—29

them filed a vigorous protest against any such proceeding.

It is then alleged, in substance, that in 1914 the defendant Hanks became a candidate for the office of county judge, and was elected upon his pledge that he would complete the courthouse on Block 10 as soon as possible; that the county was under a binding contract with the owner of the land to complete that courthouse; that the structure is valueless for any other purpose, and if not completed it will be a total loss to Klamath County; that at the times when estimates were made and levies proposed, taxpayers of the county were informed and believed that such levies and assessments were made for the purpose of completing that courthouse; that they never did have any notice of any other or different intention at the times when such levies were made; that on March 20, 1918, there was filed in the Circuit Court of Klamath County a suit by the present defendant, John Koontz, to enjoin and restrain the County Court from entering into any contract which would divert the courthouse fund from use on Block 10 to any other location or for any other purpose; that a copy of the complaint was then served upon the members of the County Court prior to the opening or consideration of any of the sealed bids; that the plaintiff had knowledge of the suit, and that the contract with the plaintiff was entered into after it was filed, and over the protest of the eleven hundred voters. It is further averred that there were no available funds, actual or potential, for the construction of a courthouse on Block 35; that after the execution of Dougan's contract, upon the charge that Hanks had violated his pre-election pledge, a recall was instituted against the latter, resulting in his removal from

office and the election of the defendant Bunnell on April 22d to succeed him as county judge; and that prior to the election, in violation of law and in fraud of the county, the sum of $41,548 was paid to Dougan on his alleged contract.

As a second further and separate answer and 'defense, and by way of estoppel, defendants allege, in substance, that Dougan ought not to be admitted to say that the alleged agreement is a valid, subsisting contract, for the reason that he was charged with, and had notice of, the journal entries and the proceedings of the County Court; that it was a matter of public record that the special courthouse fund was levied and collected for the express purpose of constructing a courthouse on Block 10, and that there never was any special fund to construct a courthouse on Block 35; that the contract of the plaintiff was illegal and void *ab initio,* and was never executed or authorized by the County Court; that he is estopped to claim or assert that he had a valid or binding contract with the County Court, or that the courthouse was constructed under any contract with the County Court; that he was charged with notice that there were not sufficient, or any, funds for the construction of a courthouse on Block 35; that he ought not to be admitted to say that the sum of $41,548 was paid upon the certificates of McClaran as agent of the county, for the reason that there was no contract by which McClaran was to act as such agent, or that after receipt of notice to cease work he continued with the construction, for the reason that he knew that the County Court could not issue any orders or warrants in his favor after the county had declared the alleged contract to be null and void, and well knew that no claim had ever been made for any dam-

ages due for the alleged breach of the contract, and
that he ought not to be permitted to recover or to
enhance the damages against Klamath County on
account of any labor performed or material fur-
nished.  Defendants pray for a decree that the order
of the court in this suit restraining the prosecution
of the action at law of the defendant county to re-
cover money paid on the contract should be dissolved,
and that it should be permitted to prosecute its ac-
tion; that the complaint herein should be dismissed,
and that, should the court refuse to dissolve the in-
junction, the county should have judgment against
the plaintiff for $41,548, ''and for such other and fur-
ther relief as to the court may seem meet and proper
in the premises.''

A reply was filed denying all of the new matter of
the further and separate answers, and affirmatively
alleging that the county never had acquired title to
Block 10; that at the time of the execution of the
contract the defendant county represented that there
was $133,241.97 in the special courthouse fund avail-
able for the construction of the building on Block 35;
that Dougan believed said representation and relied
thereon; that otherwise he would not have executed
the contract or constructed the building; and, gen-
erally, that the defendant county ought not to be ad-
mitted to claim or assert that the contract was void,
or that Dougan's claim should not be allowed and
paid out of the special courthouse fund; and, in sub-
stance, that his contract is valid and binding upon
the county, and that the latter is, and should be,
estopped to claim or assert either of the defenses
pleaded in its further and separate answers.  Pend-
ing the instant suit, the county was enjoined from
prosecuting its action or paying any money out of

the special courthouse fund.    After the taking of testimony, the Circuit Court made certain findings of fact and conclusions of law, upon which it granted a decree dissolving the restraining orders issued against the county, and dismissed the suit.    Plaintiff appeals.    REVERSED.    DECREE ENTERED.

For appellants there was a brief over the names of *Mr. Harrison Allen, Mr. A. E. Reames, Mr. C. F. Stone* and *Mr. John R. Latourette,* with oral arguments by *Mr. Allen* and *Mr. Reames.*

For respondents there was a brief with oral arguments by *Mr. F. H. Mills, Mr. Jay Bowerman* and *Mr. E. L. Elliott.*

JOHNS, J.—As we construe the pleadings, the complaint is founded upon the theory that Dougan had a valid and binding contract with the defendant county for the construction of a courthouse on Block 35, at an agreed price; that, having completed his contract, he is entitled to a decree of specific performance against the county and for the recovery of the balance due on the contract price, and that it should be paid out of the special courthouse fund. It is the theory of the defendants that the contract was null and void *ab initio;* that it was never authorized or legally executed, and that there never was any special fund to construct a courthouse on Block 35; that Dougan knew, or should have known, that it was not a valid contract, and that there was no special fund to construct a courthouse on Block 35; that the $41,548 was wrongfully and unlawfully paid to Dougan, and that the county is entitled to a decree for its repayment; that, after the receipt of notice to the effect that the contract was null and void and

canceled, it was the duty of Dougan to cease construction and present any claim which he might have against the county as damages; and that he had a complete and adequate remedy at law.

This suit has been bitterly contested, and the record is voluminous. Although there is no pleading alleging specific acts of fraud, defendants contend that the facts show such legal or constructive fraud as to vitiate the contract. It appears that J. M. Dougan, who was the real plaintiff, was 76 years of age; that he had been in the contracting business for 54 years, the last 40 of which were in Oregon and Washington; that he had constructed the United States National Bank, the Benson Hotel, the Telephone Building adjoining, in the City of Portland, and a subtelephone building in Oakland, California, at a cost of $550,000; four other courthouses in the State of Oregon, including the United States Courthouse and Postoffice at Medford; and that he built a postoffice at Los Angeles at a cost of a million and a half dollars. The record shows that in response to the advertisement Dougan submitted his bid on each courthouse, and in both instances was the lowest bidder. On Block 35 his bid was $131,775, and he testified that the building actually cost $137,000, and that there would have been a substantial profit to him if he had been awarded the contract for the completion of the courthouse on Block 10. There is no proof tending to show that Dougan had any personal interest in building a courthouse on Block 35 or as to where it should be constructed. It is clearly brought out in the record that he lost on his contract, and that if his bid on Block 10 had been accepted he would have made money. The evidence is conclusive that there was no fraud, actual or constructive, on the part of Dougan.

Section 937, Oregon Laws, among other things, enacts:

"The County Court has the authority and powers pertaining to county commissioners to transact county business; that is—

"(1) To provide for the erection and repairing of courthouses, jails, and other necessary public buildings for the use of the county; * *

"(7) To estimate and determine the amount of revenue to be raised for county purposes, and to levy the rate necessary therefor, together with the rate required by law for any other purpose, and cause the same to be placed in the hands of the proper officer for collection; *. *

"(9) To have the general care and management of the county property, funds, and business, where the law does not otherwise expressly provide."

As stated, nothing was said in the special levies of 1909, 1910, and 1911 as to where the courthouse should be constructed. It was specifically provided in the levies for the years 1913 and 1914 that they were made for the purpose of constructing a courthouse on Block 10, and all the moneys derived from the levies for the years 1909 to 1914, inclusive, were used for that purpose. Thereafter no levy was ever made for the express purpose of constructing a courthouse on Block 10. All subsequent levies were made for "new courthouse construction," and "to be used in the construction of a new courthouse," without specifying where it should be built. The moneys derived from the levies after the year 1914 accumulated from year to year, were all placed and kept in a separate and distinct account known and designated as the "special courthouse fund."

In this situation the County Court, in November, 1917, acting as a unit, and after due consideration, employed three reputable architects, two in Portland

and one in San Francisco, to make an examination and report as to the actual condition of the unfinished courthouse on Block 10 and the cost of its completion. Such written reports were made and filed, showing that to finish the building under the original Mc-Dougall plans would cost from $138,000 to $210,000, and that by changing the specifications it would cost from $120,000 to $193,000, depending upon the changes; and two of them found that it would require $30,000 additional for the improvement of the grounds. As a result, on January 25, 1918, the county employed architects to draw plans and specifications for a courthouse for Klamath County and supervise its construction. Plans were prepared for the completion of the courthouse on Block 10 in accord with the original McDougall plans, as modified by the County Court, and also for an entirely new building on Block 35.

It appears from the record of February 21, 1918, that "after discussion of said plans with the architects it was considered for the best interests of the people and taxpayers of the county to call for bids for the completion of the present new courthouse and for the construction of an entirely new building according to the plans at this time submitted." It was then ordered that notice to contractors be published for bids for the completion of the old and the construction of a new building, "so that the court may be informed of the best course to pursue, taking into consideration the best interests of the county." Pursuant to such published notice five different bids on each courthouse were received, and on March 20, 1918, they were opened. The lowest bid for the completion of the courthouse on Block 10, under the McDougall plans, as modified by the County Court,

was $181,546, the lowest for the construction of the courthouse on Block 35 was $131,775, and on each Dougan was the lowest bidder. Commissioner Short moved that all bids be rejected. This motion was lost. The journal of that date shows that, "after reading and comparing the bids, the court decided to accept the bid of J. M. Dougan Co. for the alternate building of a new courthouse on the site of the old courthouse on Block 35, original town, for the sum of $131,775, and a contract was entered into and signed by J. M. Dougan, first party, and Marion Hanks, County Judge, and F. H. McCornack, County Commissioner, for the county." Considerable feeling and discussion arose from the action of the County Court in calling for bids on both courthouses, which resulted in the County Court making the record in its journal of March 8, 1918.

1, 2. Under Section 937, Oregon Laws, subject only to the constitutional limitation as to indebtedness, and in the absence of fraud, the County Court has authority to enter into a contract to build a courthouse. In doing so the county judge and commissioners act for, and are the fiscal agents of, the county, and do not exercise a judicial power. In the transaction of such business their acts can only be reviewed, set aside, or impeached upon the ground that they are illegal or tainted with fraud, either actual or constructive.

In *Avery* v. *Job*, 25 Or. 512–524 (36 Pac. 293, 926), this court states the rule:

"No principle of equity jurisprudence is, perhaps, better established than that when the officers of a municipal corporation are clothed with a discretionary power, and are acting within the scope of such power, a court of equity will not sit in review of their proceedings, or interfere by injunction, at the

suit of a private citizen, unless fraud is shown, or the power or discretion is being manifestly abused to the oppression of the citizen. The fact that the court would have exercised the discretion in a different manner will not warrant it in interfering. * *

"Now, in this case the matter of erecting or purchasing waterworks is, by the charter of Corvallis, committed to the judgment and discretion of the council, and whether they act wisely or unwisely in so doing it is not the province of a court of equity to interfere, so long as they exercise such judgment or discretion in good faith."

In *Shebley* v. *Quatman,* 66 Or., page 448 (134 Pac. 71), it is said:

"Courts will not presume fraud, and will not find fraud except upon clear and satisfactory testimony."

3. There is no evidence that Dougan was guilty of, or a party to, any fraud. Under the facts shown it was a difference of opinion only as between the contending factions as to where the courthouse should be located, and as to what was for the best interests of the county. It had a valid title to Block 35, where the old courthouse stood. It did not have a valid title to Block 10 and could not acquire the title without completing that courthouse. In this situation, the County Court sought the aid and advice of three leading architects as to the condition of the old building and the amount which would be required to complete it, and received and considered their written reports. Based upon those reports, it then employed an architect to draw plans and specifications for the completion of the old courthouse on Block 10 in accord with the modified McDougall plans as the same were approved by the court, also plans for the construction of a new courthouse on Block 35. It next called for, and received, bids on both buildings. In

all of such proceedings the County Court acted as a
unit until such time as a majority accepted Dougan's
bid for the construction of the courthouse on Block
35, and entered into the written contract, which is
the subject matter of this suit.   All of such proceed-
ings were a matter of public record and up to that
point the board was acting in harmony.   Although
people may differ as to what the County Court should
have done, as to what was then for the best interest
of the county, and as to which bid should have been
accepted, the letting of the contract was the exercise
of a discretionary fiscal power vested in the County
Court under Section 937, Oregon Laws, and the evi-
dence does not sustain the claim of the defendants
that the old County Court was fraudulent or dishon-
est in the exercise of that discretion.   Under such a
state of facts, there could be honest differences of
opinion as to what should be done, where the court-
house should be built, and as to what was for the
best interests of the county.

4, 5. About the first official act of the new County
Court was to make the journal entry of April 27th,
*supra,* to the effect that Dougan should "cease work
on such contract," and that the county would not be
responsible for the purchase of any more material.
In effect, this was an implied admission by the new
County Court that Dougan had a valid contract; that
the county was liable for the labor which had then
been performed and for the material furnished; and
that it then wanted to terminate the contract and
stop any further liability.   Outside of the fact that
this journal entry was made, there is no evidence that
it was ever served upon Dougan, or that he ever had
any personal knowledge of it.   For such reasons it
would not have any legal effect.   It is very apparent

that this notice was not served, for the reason that the County Court later took another and different position. This action was followed by the journal entry of May 2d, *supra,* in which for the reasons therein stated the County Court then declared the Dougan contract null and void and cancelled. Mr. Stone accepted service of that order as attorney for Dougan, and a certified copy of it was served upon the superintendent of the plaintiff. Later the order was made directing the district attorney to bring action against Dougan to recover the $41,548 previously paid, upon the theory that the contract was null and void, and that the payment had never been legally authorized. In their further and separate answer defendants allege, in substance, that Dougan should be estopped to claim or assert, after the receipt of such notice, "that they proceeded with said alleged courthouse, and should be entitled to recover for material ordered therefor" after the County Court had declared the contract null and void, and that he had never made claim "for any damages due for alleged breach of said contract, and ought not to be permitted to recover from Klamath County or to enhance the damages against Klamath County, or to make any claim for any labor or material furnished or work done." The vital question in this case is, whether, after the receipt of such notice, Dougan could go on and complete the contract, and then recover the full amount of his claim against the county. *Clark* v. *Marsiglia,* 1 Denio (N. Y.), page 317 (43 Am. Dec. 670), lays down the rule:

"The measure of damages against a party who has employed another to do certain mechanical work at a price agreed upon, and who has countermanded his directions and forbidden the further execution of the work, after it had been commenced, is not the whole

amount agreed to be paid, but a just recompense for such injury as the party employed has sustained on account of the breach of the agreement. The party so employed has no right to proceed with the work after such countermand.''

This is the leading case on that question, and the legal principles are followed and sustained in Cyc., Vol. 9, page 638; R. C. L., Vol. 6, page 1031; and C. J., Vol. 13, page 655, with numerous authorities cited. Appellants recognize the force of that rule, but contend that it does not apply to the instant case. Distinguished counsel have not cited, and after diligent search we have not found, any authority, *pro* or *con,* as applied to the facts here. They are peculiar. The county is the real defendant, and it was in debt beyond its constitutional limitation. It had no legal right to enter into a contract for the construction of a courthouse to be paid out of its general fund, and legally could contract only for the building of a courthouse to be paid out of its special fund. Taxes had been assessed, levied, and collected from year to year for the express purpose of building a courthouse. To that end the Dougan contract was signed, and in good faith he entered upon its performance. After he had partially performed, and contracted debts and liabilities for which he was personally liable ranging from $60,000 to $90,000, he was then notified that his contract was null and void and cancelled. The county did not pay, or offer to pay, him for what he had done, or to release him from any of his liabilities incurred under his contracts for material. This was followed by an action to recover from him the money which he had received. The only fund which the county had or which was available to Dougan was the special courthouse fund, which had been

assessed, levied, and collected for the sole purpose of constructing a courthouse. Under such a state of facts, if Dougan had acquiesced in the notice of the county to terminate, his remedy would have been an action at law in damages for a "just recompense for such injury as the party employed has sustained on account of the breach of the agreement," for which he would have obtained a judgment against the county. In such an action the liability of the county would not be founded upon a contract for the construction of a courthouse, payable out of its special fund, but would be based upon damages arising from, and growing out of a breach of the contract by the county, payable only out of its general fund. For such reasons the judgment would be a nullity. This is a suit in equity, to reach a specific fund which had been collected and existed for a specific purpose. The contract was made with reference to that fund. Without doing, or offering to do, equity, can the county breach the contract and relegate Dougan to an action at law in which his judgment would be a nullity?

As stated, from year to year taxes have been levied and collected for the specific purpose of building a courthouse, and were set aside and carried in a separate fund for that purpose, and the law says that such fund must be used and applied to the specific purpose. The rule is well stated in Cyc., Vol. XI, page 510, which reads:

"Where special county funds are authorized, and are in fact raised, for a particular purpose, they must be applied thereto and cannot be diverted to any other purpose or transferred to any other fund, unless a surplus remains after satisfying the indebtedness or demands for which the fund was originally created; and, where special funds are authorized and

raised for a particular purpose, their application to the original purpose may be compelled by a taxpayer.''

This rule is approved in C. J., Vol. XV, page 584, and in the discussion of which it further says:

''Also where by statute a certain claim is payable out of a particular fund, the county is not liable to pay it out of any other fund; and where money has been improperly paid out of a special fund, it cannot be recovered as general county funds.'' Citing *Loe* v. *State*, 82 Ohio St. 73 (91 N. E. 982).

In *State* v. *Mikkelson*, 24 N. D. 175 (139 N. W. 525), it is said that:

''A fund derived from drainage assessments is a trust fund, to be applied to the purposes of drainage only, and the county is the trustee thereof, * * without legal authority to divert it to other uses.''

In *Adams* v. *Helms*, 95 Miss. 211 (48 South. 290), the syllabus says:

''The board of supervisors being required (Code 1906, § 307) to maintain a courthouse, and authorized (Code 1906, § 319) to insure the same against loss by fire, the proceeds of fire insurance policies on a burned courthouse, when collected by the county treasurer, do not become a part of the general funds of the county, but constitute a trust fund to be used only to construct a courthouse, and the character of the funds cannot be changed before the county is provided with one.''

In that case, the courthouse was insured and destroyed by fire, and the creditors of the county sought to reach the money which was paid on the policy of insurance. The court says:

''It is a trust fund, to be used only for the purpose of replacing the property destroyed, so long as the county stands in need of the thing so destroyed. It required no order of the board to give this effect to the fund. Indeed, no order of the board can

change the character of the fund until the county has had the things replaced.''

6. The journal entry of the new County Court, May 2, 1918, a copy of which was served on Dougan, and is in the statement, *supra*, recites that his contract is null and void and is canceled, and specifically sets forth and defines the reasons why it is null and void. Having adopted that resolution and specifically defined its reasons, can the county again change its position, and now recognize the Dougan contract as valid, and claim that it was terminated by the service of a notice which declares that it is null and void and defines the reasons why? His contract could not be terminated without notice, and the only one which was ever served was a copy of the resolution of May 2d to the effect that the contract was void *ab initio* and that Dougan had never had a contract. A notice to terminate implies the fact that a contract was once in existence, and that one of the makers wants to stop any further liability. If the contract was null and void and never existed, there was no contract to terminate. The changed position, and the intention of the new County Court in serving the notice of May 2d, is very apparent. Bunnell was elected because he opposed the construction of the new courthouse on Block 35, and was in favor of the completion of the one on Block 10, and it was the intent of his court to use the special courthouse fund for that purpose. This would have left Dougan without any remedy. The county had a valid title to Block 35, and from day to day, as labor was performed, material furnished, and the building constructed it all became and was the exclusive property of the county. Dougan never did have any title or interest in the building itself. The only claim which he had or could enforce was

against the county, for its construction. The theory of the defense is, that his contract was null and void; that it was never legally executed; that he never did have a claim against the county; and that he should refund the money which he had received. The notice which was served upon Dougan did not in any way recognize but specifically denied, the existence of any contract. By it the county advised him that his contract was null and void, and this was promptly followed by an action to recover the money paid. Under such a state of facts, in equity and good conscience could the county terminate the contract without first placing, or offering to place, Dougan *in statu quo*. Without offering to do justice, can the county, by its own conduct, deprive Dougan of an equitable remedy and consign him to a worthless action at law.

7. There is no specific provision in the written contract that Dougan shall be paid out of any particular fund. The county had previously assessed, levied, and collected taxes for the construction of a new courthouse, and the contract was for that purpose, and it was to be upon land to which the county then had a valid title. It had no legal right to enter into a contract for the construction of a courthouse to be paid out of its general fund. Such an agreement would have been null and void, and unenforceable. We cannot assume that Dougan ever intended to enter into a contract to build a courthouse, and furnish a good and sufficient bond for its faithful performance, without compensation, or that the county then contemplated that it would get a new courthouse for nothing. The rule of construction of contracts is well stated in R. C. L., Volume 6, Section 244, where it is said:

"Necessary implication is, beyond doubt, as much a part of an instrument as if that which is so implied were plainly expressed. If it can be plainly seen from all the provisions of the instrument, taken together, that the obligation in question was within the contemplation of the parties when making their contract, or is necessary to carry their intention into effect—in other words, if it is a necessary implication from the provisions of the instrument—the law will imply the obligation and enforce it. The policy of the law is to supply in contracts what is presumed to have been inadvertently omitted by the parties, the parties being supposed to have made those stipulations which as honest, fair, and just men they ought to have made. Therefore, whatever may fairly be implied from the terms or nature of an instrument is, in judgment of law, contained in it. One who undertakes to accomplish a certain result agrees by implication to supply all the means necessary thereto. He is bound by implication to do everything necessary to enable him to perform his contract. In fact, it may be said that contracts impose on parties, not merely obligations expressed in them, but everything which by law, equity, and custom is considered incidental to the particular contract, or necessary to carry it into effect. Whatever the law necessarily implies in a contract, is as much a part thereof as if expressly stated therein."

It must follow that, in equity and good conscience, the contract was made with reference to the special courthouse fund, and that both parties then contemplated and understood that the price should and would be paid out of that fund. This is further evidenced by the fact that with approval of a majority of the county court, warrants were drawn upon, and $41,580 was actually paid to Dougan out of that fund. The fund was raised to build a courthouse. The contract was let for that purpose, and it could be paid for out of that fund only.

8, 9. Respondents vigorously contend that the special courthouse fund was all levied and collected for the specific purpose of constructing a courthouse on Block 10, and that no part of it should be used in building a courthouse on Block 35; and it is true that the levies for the years 1913 and 1914 were made for the express purpose of the building on Block 10. Chapter 234, page 458, Gen. Laws Or. for 1913, known as the Budget Law, is entitled:

"An act to require estimates of amounts to be raised by taxation by any county to be made and published in advance of levy, and to provide for public meetings and discussions by the taxpayers of proposed levies; to prevent levy of taxes in certain cases greater than the estimates, or greater expenditures of public moneys than such estimates and 10 per cent thereof, and for other purposes."

Section 1 makes it unlawful for any tax—

"To be levied, proposed or adopted, * * unless an estimate shall have first been made of the amount of money proposed to be raised by taxation for the ensuing year and such estimate published, and opportunity for a full and complete discussion thereof allowed in the manner hereinafter provided for."

The estimates shall be fully itemized, showing under separate heads the amount required for each department of county government, the maintenance of county institutions or buildings, and the salaries of officers,—

"The construction, operation, and maintenance of each public utility, and * * a complete disclosure of the contemplated expenditures * * proposed to be raised by taxation, showing the amount of each * * ."

Section 2 enacts that such estimates with a notice of the time and place at which they will be considered, shall be published at least twice prior to the proposed

meeting, in an official county newspaper. Section 3 makes it the duty of the County Court to then and there meet, and hear what any taxpayer might have to say for or against any proposed levy. Section 4 provides that after the hearing the County Court shall determine the amount of taxes to be levied, and shall make a separate levy for each purpose, and that its decision shall be entered in the proper records, and that no greater tax shall be levied ''by the authority proposing such tax for the purpose indicated or collected,'' and that ''thereafter no greater expenditure of public money shall be made for any specific purpose than the amount so estimated and 10 per cent thereof.'' Section 5 provides that no tax shall be levied by the County Court except by direct vote of the people, at a meeting duly and regularly called as now provided by law and in accordance herewith, for the purpose of levying taxes in excess of the estimates published as aforesaid and 10 per cent thereof.

The purpose of this Budget Law was to require the making and publishing of an itemized statement and amount of each item of the proposed levy for the current year prior to the levying of any tax, and to give the taxpayers an opportunity to be heard as to the necessity for levying such proposed taxes and the amount to be levied for each of such items. The published budgets for the years 1915, 1916, and 1917 did not call for a proposed tax to construct a courthouse on Block 10. For those years they were for moneys for ''new courthouse construction,'' and ''to be used in the construction of a new courthouse,'' and those levies followed and conformed to the budgets. Nothing was said in either the budget or levy as to where the money should be ''used in the construction of a new courthouse.'' Although a small portion of it

was paid out on old debts which had been previously contracted, yet the fact remains that after 1914 not a dollar of the fund was ever expended upon any new work on Block 10. The fund was permitted to accumulate from year to year, and remained idle until the architects were employed to make their investigation and report. All the money derived from previous levies was paid out on Block 10.

In this situation, on March 20, 1918, the county made the Dougan contract to construct a new courthouse on Block 35. Under the facts shown to exist here, we hold that under Section 937, Oregon Laws, the County Court had the legal right, on March 20, 1918, to enter into a contract with Dougan for the construction of a new courthouse on Block 35, and to use and apply the money then in the special courthouse fund in payment for the building. The letting of the Dougan contract was followed by the recall of Hanks, and the election of Bunnell, as county judge. The published budget of December, 1918, calls for a proposed tax of $20,000 for "completion courthouse, Block 10, Hot Springs Addition to Klamath Falls." It is that published item of which the taxpayers had notice. The journal entry shows that the corresponding levy was made for "new courthouse construction." The respondents challenge the entry, and a majority of the County Court claim that it was never authorized. When we consider that Hanks was primarily recalled because he let the Dougan contract to build a new courthouse on Block 35, and that Bunnell was elected because he was opposed to the construction of that courthouse and was in favor of the completion of the one on Block 10, and the further fact that the published budget for December, 1918, called for a levy for the "completion courthouse

Block 10, Hot Springs Addition to Klamath Falls,''
it is very apparent that it was never the purpose or
intent of the new County Court to make a levy for the
construction of a courthouse on Block 35. Assuming
that the levy which was actually made was for ''new
courthouse construction,'' it must be construed with
reference to the published budget which provides for
the ''completion courthouse, Block 10,'' and when so
construed it would mean that it was the purpose and
intent of the county court to then make a levy for the
use and benefit of Block 10.

The case of *Little* v. *City of Portland*, 26 Or. 235
(37 Pac. 911), is not in point here. There is a vital
distinction both as to the facts and the remedy in-
voked.

Again, this levy was made in December, 1918, and
Dougan's contract was signed on March 20, 1918.
The complaint is drafted upon the theory that he kept
and performed his contract, and is entitled to a de-
cree of specific performance against the county, and
that the amount of his decree should be paid from
and out of the special courthouse fund. Assuming
that a contract therefor would be valid and could be
enforced, there is no evidence that the County Court
ever promised or agreed to make any future levies,
the proceeds of which were to be applied upon the
Dougan contract. This would leave nothing but a
moral obligation, if any, on the part of the county,
for which Dougan could not have a decree of specific
performance. Dougan's contract was made with ref-
erence, and related, to the special courthouse fund as
it existed or was in process of collection on March
20, 1918, and within itself would not embrace or in-
clude any moneys derived from any future levy. As
applied to the Dougan contract, no part of the money

derived from the levy of December, 1918, should be deemed or treated as a special courthouse fund, but all other moneys in that fund should be applied *pro tanto* to the amount due and owing on the Dougan contract.

It is true, as respondents contend, that under the terms of the deed, if the county does not complete and maintain a courthouse on Block 10, it may, and perhaps will, lose the money which it has expended on construction, amounting to about $150,000; but it is also true that the county never entered into a contract in or by which anyone undertook or agreed to construct or complete the courthouse on that ground, or that it ever entered into any contract with anyone to build a courthouse on that block. All the work on that building was done on "force account" by the county itself, and there was never any contract let for its construction or completion. In other words, the county itself expended the money out of the special courthouse fund in the partial construction of that building, but not a dollar of it was ever expended upon a specific contract. For such reason, there is no person who can claim or assert that he has an interest in, or a debt which should be paid out of, that fund; and therein lies the vital distinction between defendants' theory and the facts shown in the instant case.

10. Respondents also contend that it appears from the journals of the County Court that the Dougan contract was never authorized or legally executed, and cite Section 940, Oregon Laws, which provides that:

"The County Court is held at such times as may be appointed by law and at such other as the court in term, or the county judge in vacation, may appoint,

in like manner and with like effect as the Circuit Court or judge thereof is authorized by Section 925."

Also, *State* v. *Rhodes,* 48 Or. 133 (85 Pac. 332), where it is held that:

"The county judge and county commissioners of any county in this state do not constitute the county court thereof for the transaction of county business unless they assemble at the time prescribed by law, or at a time designated by a general order of such court to that effect made and entered in the journal during the term time, or by a special order made and filed by the county judge in vacation, authorizing the transaction of certain business therein specified. The county judge of Yamhill County and a county commissioner thereof not having assembled at the time thus prescribed, they did not compose the County Court of that county for the transaction of county business."

That case was a *mandamus* proceeding to compel the County Court to make an order declaring the result of an election, and did not arise out of the transaction of county business by the county commissioners as the fiscal agents of the county.

In the case at bar it conclusively appears from its journal entries that the County Court was harmonious. All of its members acted as a unit in preparing the budgets; in making the levies for the years 1915, 1916, and 1917; in the employment of the architects to examine and report as to the condition of the building on Block 10; in the employment of an architect to prepare plans and specifications for the completion of the old building and the construction of the new; in the receiving and consideration of such reports and the approval of each set of plans and specifications; in the publication of notices that bids would be received, and in the receipt and consideration of such bids. All of such things were done in harmony

and with the full approval of each member of the court. The record also shows that all of its members were present and acting when the motion of Commissioner Short to reject all bids was lost, and when the contract was awarded to Dougan, which was later signed by a majority of the court. It further appears that all such proceedings were held in the County Court room; that all of such business was transacted either at a regular or an adjourned meeting of the board; and that all of such proceedings except the actual awarding and signing of the contract, were the official acts of every member of the County Court.

11. After Judge Hamilton's decree was rendered, and on application to this court, the former restraining order was renewed upon the giving of an approved bond, and is now in force and effect. Upon a proper showing, and as one of the conditions of that order, the county was authorized to expend not to exceed $5,000 out of the special courthouse fund in the protection and preservation of the building on Block 10. We are not advised as to the amount which was actually expended, but all of that money should be paid out of proceeds from the levy of December, 1918, which was made for the use of that building, and no part of it should be paid out of the courthouse fund as it existed at the time of the Dougan contract.

12. On January 25, 1918, the County Court entered into a written contract with the firm of McClaran, Houghtaling & Dougan, architects, to prepare plans and specifications for the completion of the county courthouse on Block 10, and the construction of the new courthouse on Block 35, and to superintend the work of the one selected at an agreed compensation

of seven and one-half per cent of the contract price, with the specific provision that the fee should be paid out of the courthouse fund. It appears that about the time the Dougan contract was let warrants were drawn to the architects and paid out of that fund, amounting to $6,788.76. On the face of the record, that was a proper payment. It does not appear that any further payments were made to the architects, but the firm, as such, is not a party defendant, and the balance due, if any, or how it should be paid, is not before the court and could only come here upon a stipulation signed by all parties in interest. It also appears that pending the suit and upon orders of the trial-court attorneys for defendants have been paid, on account of fees, certain amounts out of the courthouse fund. In equity, no part of such fees should be taken out of, or charged to, the fund for the courthouse on Block 35. Beyond that point the question of how such payments should have been made, also is not before the court.

13. After a careful consideration of the numerous questions presented in the able and exhaustive briefs of opposing counsel, we hold that all of the money which was in the special courthouse fund on March 20, 1918, or in process of collection, could be used and applied in the construction of a new courthouse on Block 35; that the County Court had the power and authority to, and that it did, legally make the Dougan contract; that he entered upon its performance and completed the building in accord with its terms; that it was never terminated by the county; that there is now justly due and owing Dougan under that contract $92,674.95; that the taxes derived from the levy of December, 1918, are not a part of the special courthouse fund for the building of a court-

house on Block 35, and that no portion thereof should be applied upon the Dougan contract; that all the money which was paid by the county under an order of this court *pendente lite*, for the preservation of the building on Block 10, should be paid only out of the proceeds of the taxes which were collected under the levy of December, 1918; that no part of such attorney's fees shall be charged to, or paid out of, the fund for Block 35; that Dougan should have a decree against the county for the full amount of his claim, and for the costs and disbursements of this suit, which costs and disbursements shall be a claim against the county and payable out of its general fund; that the whole amount of the special courthouse fund for Block 35, as defined in this opinion, shall be applied upon the payment and *pro tanto* satisfaction of $92,674.95, the amount of Dougan's claim.

The decree of the lower court will be reversed, with costs to the appellant, and one entered here in accord with this opinion. Pending such application of the fund, the existing injunction will remain in force and effect.               REVERSED.   DECREE ENTERED.

REHEARING DENIED.

BENSON, J., not sitting.

BROWN, J., had not qualified and took no part in the consideration of this case.