Argued December 1; affirmed December 22, 1942

# OLLILO *v.* CLATSKANIE PEOPLES' UTILITY DISTRICT ET AL.

(132 P. (2d) 416)

Before KELLY, Chief Justice, and BELT, BAILEY, LUSK, ROSSMAN and BRAND, Associate Justices.

*Gunther F. Krause*, of Portland, for appellant.
*Gus J. Solomon*, of Portland, for respondents.

BELT, J. Plaintiff, a voter and taxpayer in Clatskanie Peoples' Utility District in Columbia county,

commenced this special proceeding under and by virtue of § 114-259 (c) O. C. L. A., as amended by Ch. 287, Oregon Laws 1941, to determine the validity of certain revenue bonds, the issuance thereof purporting to have been authorized by an election held on March 7, 1942, and an ordinance enacted by the board of directors of said district on September 5, 1942.

Plaintiff challenges the validity of the election on the following grounds: (1) The official ballot did not contain an adequate statement of the purposes for which such revenue bonds were proposed to be issued. (2) The statement in the official ballot is in the alternative so that a voter could not be apprized of the purpose for which said bonds were to be issued.

Plaintiff asserts that the ordinance purporting to direct the issue and sale of the bonds is invalid in that:

"1.  Said ordinance provides for the sale of revenue bonds and the money therefrom to be used solely for the acquisition and purchase of an electric distribution system and properties incidental thereto in violation of Section 114-202, subdivision 7 and Section 114-245, subdivision 6, O. C. L. A.

"2.  That no part of said money is to be used for the development and transmission of water or water power as required by the provisions of said Peoples' Utility District Law.

"3.  Said ordinance fails to carry out its purposes and the purposes for which said bonds were authorized by merely providing for the issuance of a portion of the revenue bonds authorized at the revenue bond election.

"4.  That the issuance of bonds in the aggregate principal amount of $175,000 for the purchase of the West Coast properties contemplates the 'piecemeal' acquisition of an electric utility system, and therefore does not comply with the statement of purpose contained in the official ballot (Exhibit B) and violates the provisions of Section 114-256, O. C. L. A.

"5. That that portion of said ordinance which provides that the District reserve the right to redeem bonds on any interest payment date on or after July 1, 1950, is invalid and illegal in that it violates Section 114-255, O. C. L. A., as amended by Chapter 287, Oregon Laws 1941.

"6. That that portion of Section 1 which provides that in the event the Directors do exercise the option to redeem bonds on any interest payment date on or after July 1, 1950, the District will pay to the respective bond holders upon surrender of the bonds additional interest in the amount specified in said bond ordinance, is illegal and invalid by reason of the fact that it violates the provisions of Section 114-255, O. C. L. A., as amended by Chapter 287, Oregon Laws 1941."

A general demurrer to the petition was sustained and, upon refusal of the plaintiff further to plead, the suit was dismissed.

It appears from the resolution of the Clatskanie Peoples' Utility District—hereinafter referred to as the District—that the election was called to submit to the voters the question of the issuance of revenue bonds aggregating $237,000. It also appears from such resolution, which is attached to the petition and made a part thereof as Exhibit A, that the board of directors of the District desired by such bond issue to acquire the electric utility properties of the West Coast Power Company and the Northwestern Electric Company operating within the boundaries of the district and the electric utility properties of Wauna Lumber Company and the Westport Lumber Company operating outside the boundaries of the district. It is observed that it was not the desire of the board of directors to acquire a hydroelectric power plant but an electric transmission and distribution system. We are advised in the briefs, although it does not appear from the petition,

that the district has contracted to obtain electric power from the Bonneville Power Administration.

The election resulted in approval of the bond issue in the amount of $237,000. The official ballot, in keeping with the resolution of the board of directors calling the election, stated that the purpose of the proposed bond issue was to acquire by "purchase and construction, or by construction" certain properties for the "development, transmission, and distribution of electric energy and the making of the necessary betterments and extensions to such electric systems."

■ We see no invalidity in the election by reason of the statement of the purpose for which it is proposed to issue the bonds. Section 114-256 O. C. L. A. requires that before any district shall issue revenue bonds it must be authorized so to do by the voters of the district at an election called for the submission of such question. It is also provided therein that the election ballot must contain a statement of "the amount of bonds to be voted and the purpose for which such bonds are to be used." Appellant's contention that the purpose as expressed in the instant case is dual in character is supported by the minority rule. The great weight of authority is that a proposition submitted to the voters to "purchase or construct" a plant or public utility is single in purpose. After the bond issue is approved, it is a matter of discretion for the board of directors—the governing body of the district—to determine whether to purchase or construct the utility electric system. The single objective is the acquisition of an electric utility system. It is not necessary—according to the majority rule—to state the method and details of acquiring such system. The interests of the districts are best served by leaving the question as to

whether to "purchase or construct" a utility system to the sound business judgment of its directors. *Mississippi Power & Light Co. v. Town of Batesville*, 187 Miss. 737, 193 So. 814; *Thomas v. McHugh*, 65 N. D. 149, 256 N. W. 763; *State ex rel. v. Snyder*, 129 Ohio State 206, 194 N. E. 415, and numerous authorities listed in note 5 A. L. R. 538. Counsel for appellant, with commendable frankness, concedes that the above conclusion is in accordance with the majority rule. We think it is also in keeping with the better-reasoned cases.

Having concluded that the bond election is valid, we now turn to the validity of certain provisions of the ordinance directing the issue and sale of the bonds. Appellant asserts that an ordinance providing for the sale of revenue bonds for the purpose of acquiring an electric transmission and distribution system is invalid because it does not contemplate the development, purchase, or operation of a utility as defined in the Peoples' Utility District law. More simply stated, it is urged by appellant that every utility district under the law must own or operate a hydroelectric power plant in addition to an electric transmission or distribution system.

The source of power to create municipal corporations known as Peoples' Utility Districts is found in Art. XI, § 12 of the Constitution of Oregon—an amendment submitted by initiative petition and approved on November 4, 1930, by vote of the people—which, so far as is material herein, provides:

"People's utility districts may be created * * * for the purpose of supplying water for domestic and municipal purposes; for the development of water power and/or electric energy; and for the distribution, disposal and sale of water, water power and electric energy. Such districts shall

be managed by boards of directors, consisting of five members, who shall be residents of such districts. Such districts shall have power:

\* \* \* \* \* \* \*

(c) To issue, sell and assume evidences of indebtedness.

(d) To enter into contracts.

\* \* \* \* \* \* \*

(g) To acquire, develop, and/or otherwise provide for a supply of water, water power and electric energy.

Such districts may sell, distribute and/or otherwise dispose of water, water power and electric energy within or without the territory of such districts.

The legislative assembly shall and the people may provide any legislation, that may be necessary, in addition to existing laws, to carry out the provisions of this section."

The Legislature, in subsection 7 of § 114-202 O. C. L. A., thus defines "utility":

" 'Utility' means a plant, works and/or other property used for the development and/or transmission of water for domestic and/or municipal purposes, waterpower and/or electric energy; provided, that transmission of water shall not include water for irrigation or reclamation purposes, except as secondary to and when used in conjunction with a hydroelectric plant."

■ The difficulty in construing the constitutional amendment and the statute enacted to carry out the will of the people relative to the creation of "Peoples' Utility Districts" arises out of the use of the words "and/or"—a sort of verbal monstrosity which courts have quite generally condemned. 3 Words & Phrases (Permanent Edition) 450; *Kornbrodt v. Equitable*

*Trust Co.*, 137 Or. 386, 2 P. (2d) 236, 3 P. (2d) 127. When this hybrid phrase is used it generally tends towards confusion. Courts struggle with "and/or" to determine what it means and generally end in bewilderment. It is universally held, however, that "and" may be construed to mean "or" when necessary to effectuate the intention of the legislature and to avoid an unreasonable or absurd result: *Kornbrodt v. Equitable Trust Co.*, supra.

■ Construing "and/or" as used in the constitutional amendment and in the statutory definition of "utility" as meaning "or", we conclude that it is not necessary for a utility district to own or operate a hydroelectric power plant in order to sell and distribute electric energy. In other words, a utility district may be legally created for the purpose of acquiring an electric transmission or distribution system, a hydroelectric power plant, or both. Any other construction would be ruinous to the purpose and spirit of the "Peoples' Utility District Law" as few of the districts are financially able to acquire separate hydroelectric plants.

It is reasonable to assume that the voters in enacting the constitutional amendment authorizing the creation of electric utility districts appreciated the fact that there are sparsely populated sections of the state having low assessed property valuation and not adapted to the development of water power where it would be impracticable to create a district capable of having an independent hydroelectric plant. It must have been contemplated that, in some instances, it would be necessary to purchase power.

■ The Hydroelectric Commission, charged under the statute (§ 119-106 O. C. L. A.) with the administration of water power projects to generate electricity has

throughout the years construed the Peoples' Utility District Law in keeping with the construction above stated. The contemporaneous construction of an act by an administrative body charged with its execution is highly persuasive: *Broadway-Madison Corporation v. Fisher*, 164 Or. 401, 102 P. (2d) 194; *Spencer v. City of Portland*, 114 Or. 381, 235 P. 279.

The bond election resulted in authorizing the district through its board of directors to issue revenue bonds in the principal amount of $237,000. Appellant asserts that the ordinance purporting to direct the issue and sale of $175,000 of such bonds for the purchase of the West Coast properties is invalid in that the proposed system cannot be acquired "piece-meal" and is violative of § 114-256 O. C. L. A. which provides:

"Before any district shall issue any general obligation or any revenue bonds, the question whether such bonds of said district shall be issued shall be submitted to the qualified voters of the district, either at any general, state or county elec-election or at a special election called for that purpose by the board of said district. Notice of such election shall be given as herein provided. At such election the ballots shall contain a statement of the amount of bonds to be voted on and the purpose for which such bonds are to be used. If a majority of those voting on the question vote 'yes', provided the voters have voted on the question as in this act provided, the board of directors of said district shall be authorized and empowered to issue bonds of the character and in the amount designated by such ballot at said election, otherwise not."

We think the above section does not require the immediate sale of all revenue bonds authorized at an election. Neither is the board required to purchase at one time all the property contemplated by the bond

issue. The properties of the West Coast Power Company constituted the principal unit of the proposed electric transmission system. Why should the district be obliged to issue bonds to purchase other contemplated properties before needed? The time for acquiring the various units of the system rests in the discretion of the board. See cases cited in note 13(b), 44 C. J. 1207. There is no showing of any abandonment of the purpose for which the bond issue was authorized.

In the case of *Weathers v. Todd County*, 271 Ky. 172, 111 S. W. (2d) 638, "the electorate of Todd County on June 20, 1926, voted to issue the bonds of the county to the amount of $300,000, the proceeds to be used for road and bridge purposes. Under the authority thereby conferred, the Fiscal Court on September 1, 1926, issued the county's bonds to the amount of $100,000. On January 1, 1929, a like sum was issued, while a $50,000 issue was made on January 1, 1931, and $33,000 on June 1, 1931, making a total amount of $283,000 with $17,000 of the voted amount unissued." On October 20, 1936, the county sought to issue the unused portion and a taxpayer filed a suit to enjoin such action. The Supreme Court held in favor of the county and stated that "by not exhausting at once the authority conferred by the election—but issuing the bonds as needed—large savings were made to the county in interest, which course was and is not only commendable, but thoroughly recommended and justified by the facts."

In *State ex rel. Boynton v. Topeka*, 141 Kan. 309, 41 P. (2d) 260, the voters authorized the issuance of bonds in a sum not exceeding $165,000 for the acquisition of sites and for the construction of fire stations. Shortly thereafter, bonds amounting to $92,000

were issued. Some years later the city attempted to issue the balance of the bonds authorized by the voters for the purpose of acquiring another fire station. A taxpayer objected, but the Supreme Court sustained the bond issue. The court held that the proposition to authorize the city "to acquire lands for sites and establish and construct thereon fire station buildings" indicated a program of improvement to be carried on in the future under the discretion of the governing body.

■ The option to redeem bonds prior to their maturity dates on or after July 1, 1950—eight years after date of issue—is not invalid. Neither do we think that to include callable and non-callable bonds in the same issue renders it invalid. Appellant concedes that the board in its discretion might issue either callable or non-callable bonds, but contends that there cannot be a combination of the two in the same issue. We see no merit in this contention. The answer lies in § 114-255 O. C. L. A., which provides:

> "* * * * * * *
>
> All revenue bonds issued under the provisions of this act shall contain a clause that the same are payable solely from revenues * * *. Every issue of bonds shall be in serial form, with definite maturities, and shall mature in annual or semi-annual instalments. The first instalment of principal shall fall due and be payable not later than five years, and the last instalment not later than thirty years, after the date of issue * * * but all such bonds, at the discretion of the board of directors, shall contain provisions for the call and redemption by the district of such bonds, or *any part of such issue*, at the option of the district, on any interest-paying date three years or more after the date of issuance thereof * * *." (Italics ours.)

■ The district in the instant case proposes a 25-year serial bond issue in the principal amount of $175,-000 dated July 1, 1942, bearing interest at the coupon rate of 4½% per annum, with maturities starting on the third year after the date of issue. As to the bonds maturing after July 1, 1951, the district reserves the right to call such bonds prior to maturity on any interest-paying date on or after July 1, 1950. It is provided in the ordinance directing the issue that ''should any of said bonds be redeemed prior to maturity as aforesaid said District will pay the respective holders upon surrender of the bonds additional interest in the amounts hereinafter specified: Holders of bonds redeemed on or prior to July 1, 1951, shall receive additional interest in the amount of three per cent (3%) of the principal amount of said bonds. Holders of bonds redeemed thereafter shall receive additional interest as follows:

| Date of Redemption. | Percentage of Principal Amount of Bonds to be Paid as Additional Interest. |
|---|---|
| January 1 and July 1, 1952 | 2¾% |
| January 1 and July 1, 1953 | 2½% |
| January 1 and July 1, 1954 | 2¼% |
| January 1 and July 1, 1955 | 2% |
| January 1 and July 1, 1956 | 1¾% |
| January 1 and July 1, 1957 | 1½% |
| January 1 and July 1, 1958 | 1¼% |
| January 1 and July 1, 1959 | 1% |
| January 1 and July 1, 1960 | ¾% |
| January 1 and July 1, 1961 | ½% |
| January 1 and July 1, 1962 | ¼% |
| January 1, 1963, and thereafter | 0%. |

The bonds have not yet been sold and, of course, we know not at what date the callable bonds will be redeemed but plaintiff, nevertheless, asserts—under a

statute purporting to give him the right to challenge the issue on any conceivable ground—that, in the event the district calls the bonds on or after July 1, 1950, it will pay interest in excess of the maximum rate fixed by statute.

Section 114-255 O. C. L. A., as amended by Ch. 287, Laws of Oregon for 1941, provides:

"All bonds shall be sold at such price that the effective interest rate upon such bonds shall not exceed 6 per cent per annum."

It is also provided in such section that the bonds shall not be sold for less than 98 per cent of their face value and accrued interest.

Assume that the bonds were sold at 98 and the callable bonds were redeemed on July 1, 1950, would the statutory maximum rate of interest be exceeded? The district in redeeming the bonds on such date would be required to pay an additional 3 per cent interest on the principal amount of said bonds. It will be recalled that the coupon rate of interest is 4½ per cent. Applying the generally accepted formula, as shown in "Comprehensive Bond Values Tables", compiled by Financial Publishing Company of Boston, such bonds would yield 5.1% per annum. The above tables in computing bond values are universally recognized by financial institutions and bond experts. The interest is computed from the time of delivery of the bonds to the date when the same are redeemed. In the above problem the interest was calculated on the basis of eight years. If the bonds were redeemed after July 1, 1950, at an interest-paying date, the interest yield would be lower. We conclude, therefore, that in no event would the 6 per cent limitation be exceeded.

The decree is affirmed.