Motion to strike abstract allowed March 25; argued on the merits at Pendleton October 27; affirmed in part and reversed in part December 2, 1947; rehearing denied February 3, 1948

STRINGHAM et al. *v.* UNION COUNTY PEOPLE'S UTILITY DISTRICT et al.

HERMANN et al. *v.* SAME

CONLEY et al. *v.* SAME

(178 P. (2d) 698, 187 P. (2d) 150)

*Charles R. Cater,* of La Grande, and *Gus J. Solomon,* of Portland, for appellants.

*Dixon and Burleigh,* of La Grande, and *Hallock, Donald & Banta,* of Baker, for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY, HAY and WINSLOW, Justices.

ROSSMAN, C. J.

These three causes are before us upon motions filed by the respondents in each of the causes to strike from our files the abstracts of record submitted in the three causes on the ground that matter has been inserted in each of the abstracts which is not a part of the circuit court's records. The respondents move in the alternative that there be deleted from each of the abstracts

of record the improper material. The latter is the same in each of the three abstracts and consists of correspondence.

■ Rule 9 of this court (9 O. C. L. A. 320) says:

"* * * The appellant shall serve upon the attorney for each respondent a printed abstract, prepared as hereinafter provided, containing a copy of so much of the matters of record * * * as may be necessary to a full understanding of the questions presented for decision * * *."

It will be observed that the contents of the abstract of record must consist of "matters of record." The motions made by the respondents must, therefore, be allowed. The appellants shall within twenty days file new abstracts or, in the alternative, delete from the present ones the improper matter. Should the respondents wish to file supplemental abstracts they may have twenty days after the appellants have complied with the order which will be entered pursuant to this opinion.

Argued at Pendleton October 27; affirmed in part and reversed in part December 2, 1947; rehearing denied February 3, 1948

ON THE MERITS

(187 P. (2d) 150)

*Gus J. Solomon,* of Portland, and *Charles R. Cater,* of La Grande (Raymond M. Kell, of Portland, on brief), for appellants.

*Harold Banta,* of Baker (Hallock, Donald, Banta & Silvan, of Baker, and Dixon & Burleigh, of La Grande, on brief), for respondents.

Before ROSSMAN, Chief Justice, and LUSK, BELT, BAILEY, HAY and WINSLOW, Justices.

BELT, J.

These three suits—consolidated for hearing in this and in the circuit court—were brought by the plaintiffs, who are residents and taxpayers of the defendant Union County Peoples' Utility District, for the purpose primarily of enjoining the "District" from using part of the proceeds of a proposed sale of revenue

bonds to purchase a unit of an electric system owned by the California-Pacific Utilities Company, a private corporation, in Union county, Oregon. For the purpose of brevity the Union County Peoples' Utility District will be referred to as the "District," the California-Pacific Utilities Company as "Cal-Pac," Union County Electric Co-operative, Inc. as "Cooperative," and Rural Electrification Administration as "R. E. A."

The basic question is whether the proposed use of such funds by the "District" constitutes an unlawful diversion. Plaintiffs contend that the proposed purchase of a part of the electric system from "Cal-Pac," the successors in interest of the Eastern Oregon Light & Power Company, a private corporation, is a substantial departure from the purpose authorized by the voters at the bond election. More specifically, plaintiffs assert that it was contemplated by the voters when they authorized the bond issue in question that the proceeds of the sale thereof would be used to purchase an electric system adequate to serve substantially all of the consumers within the "District." There are other legal questions presented—some of which will be considered herein by virtue of the Declaratory Judgment Act—but all of them relate to the basic question above stated.

A brief statement of the facts out of which this controversy arose is deemed necessary. The "District," as organized in 1940, embraced within its boundaries all of Union county, with the exception of the cities of Elgin and Island City. These two municipalities voted adversely to the formation of the "District," and were therefore excluded therefrom. When the "District" was organized, the Eastern Oregon Light & Power Company was engaged, as a public utility, in the develop-

ment and distribution of electric energy in Union and Baker counties. The "District" was confronted with the problem as to whether to purchase or construct an electric system. The "District" endeavored on numerous occasions before and after the bond election in question to consummate a deal with the Eastern Oregon Light & Power Company to acquire its interests in Union county, but its efforts were of no avail.

The "District," therefore, through its Board of Directors, passed a Resolution calling an election on November 3, 1942, to authorize the issuance of revenue bonds in the amount of $925,000.00 for the purpose— as stated in the "Notice of Revenue Bond Election"—

"  *   *   * of acquiring, either by purchase, by purchase and construction, or by construction, plant, works and other property for the development, transmission, and distribution of electric energy within or partly within and partly without the limits of said district."

The "Official Ballot" submitted to the voters the following question:

"Shall the Board of Directors of the Union County Peoples' Utility District be authorized to issue and sell revenue bonds of said District in the amount of $925,000.00, payable not exceeding thirty years from the date of issuance, for the purpose of acquiring, either by purchase, by purchase and construction, or by construction, plant, works and other property for the development, transmission, and distribution of electric energy within or partly within and partly without the limits of said District, and for the making of necessary betterments and extensions to such electric system, such bonds to be payable solely from the revenues derived from the sale of electric energy, or any other service furnished in connection therewith, after paying all

expenses of operation and maintenance, including taxes."

At this juncture it is well to state that the regularity of the proceedings leading to the bond election is not questioned. Neither do the plaintiffs assert that the bonds are invalid. The fundamental objection of the plaintiffs is that the proposed use of the bond money is a radical departure from the purpose contemplated by the voters when a majority thereof approved the bond issue.

The Board of Directors of the "District" in June, 1946, offered for sale, through sealed bids, revenue bonds aggregating $825,000.00 for the purpose, as stated in an Ordinance enacted by the "District" on July 1, 1946, of "acquiring the first unit of an electric system for said District, consisting of existing electric distribution and transmission properties of the Eastern Oregon Light and Power Company in the city of La Grande, Oregon, as well as certain electric properties outside of and adjacent to said city, and also Morgan Lake and Cove hydro electric generation facilities located in Union County, Oregon." The bonds were awarded to Ballard-Hassett Company, whose bid carried an effective interest rate of 2.3 per cent. Thereupon, the instant suits were commenced. The delivery of the bonds, however, was deferred pending this litigation.

The "District" proposes to apply $756,732.84—proceeds from the sale of bonds—for the purpose of purchasing from "Cal-Pac" that part of its electric system as above stated. The base purchase price of all the electric properties of "Cal-Pac" in Union county was fixed in the sum of $1,256,732.84. The "District," not having sufficient funds to purchase

the entire system of "Cal-Pac" in Union county, proceeded with the following plan:

One. A non-profit cooperative association was organized, viz., the "Union County Electric Co-operative, Inc.," and such cooperative was to secure a loan from the "Rural Electrification Administration," a federal agency, to enable it to purchase for the sum of $500,-000.00 the remainder of the electric system owned by "Cal-Pac" in Union county, and thereby supply electric energy to the unserved 500 farms in the county. The loan was obtained. Indeed, the "R. E. A." earmarked $1,080,000.00 in furtherance of the project and for the betterment and extension of the system.

Two. The "District" and the "Cooperative" entered into an operating agreement whereby the "District" was to operate at cost the properties to be purchased by the "Cooperative." Other provisions of this "Operating Agreement" will be considered later.

■ The "Cal-Pac," pursuant to such plan, entered into an agreement on June 11, 1946, with the "District" and the "Cooperative" for the sale of its electric properties in Union county. This "Agreement" contains terms and conditions which we deem inadvisable to discuss in view of the fact that "Cal-Pac" is not a party in any of these suits. Whatever we might say in reference to the contractual obligations of the parties thereunder would not be binding on "Cal-Pac." Even the Declaratory Judgment Act has its limitations. The Act does not contemplate the adjudication of interests of a party over which the court has no jurisdiction.

■ Having shown the general plan of the "District," "Cooperative," and "R. E. A.," we revert to the fundamental question: Was the proposed use of such funds by the "District" an unlawful diversion thereof?

It is settled that the proceeds of revenue bonds may be used only for the particular purpose authorized by the voters at the bond election. *Barde v. Funk,* 144 Or. 233, 239, 23 P. (2d) 334; 44 C. J. 1209. Neither is there any doubt about granting injunctive relief, if in fact, an unlawful diversion has been shown.

In determining to what extent and for what purpose the voters authorized the Board of Directors of the "District" to issue revenue bonds, we turn to the Resolution calling the election, the Notice of Election, and the Official Ballot. The Resolution is not so important as it is seen by only a few voters. Its principal purpose is to set the election machinery in motion, although it is required to state the purpose for which the election is called. It is the "Notice" and the "Official Ballot" that bring to the attention of the voters the specific question for their decision. *Wisconsin Power & Light Company v. Public Service Commission,* 232 Wis. 59, 286 N. W. 588, 122 A. L. R. 1135; 1 Jones on Bonds and Bond Securities, 4th Ed., § 196. However, we find nothing in the Resolution indicating that the election was called for any purpose other than that stated in the "Notice" and "Official Ballot."

We do not agree with the plaintiffs that the question of the bond issue was submitted to the voters in vague or ambiguous language. The Board of Directors was authorized, among other things, in clear, broad, and unrestrictive language in the "Notice" and "Official Ballot," to issue revenue bonds in the amount of $925,000.00 to enable it to acquire an electric system for the development, transmission, and distribution of electric energy, *"within or partly within and partly without the limits of said District."* (We have used italics to indicate the extent of authority conferred

upon the Board of Directors.) It is observed that this electric system could be acquired either by purchase or construction, or both. Substantially the same "Notice" and "Official Ballot" were before this court in *Ollilo v. Clatskanie P. U. D.*, 170 Or. 173, 132 P. (2d) 416, and the validity thereof was sustained.

■ Much evidence was admitted about pre-election advertisements, propaganda, and statements of certain officials, acting in an individual capacity, as to what was contemplated by the voters in this bond election, but we think such evidence inadmissible. Evidence of this character cannot be considered to vary or modify the language of the "Notice" and "Official Ballot." If the question of the bond issue is submitted in clear and unambiguous language, courts are not warranted in going outside of election procedure to determine what the voters may or may not have contemplated. *Bowling et al. v. City of Bluefield,* 104 W. Va. 589, 140 S. E. 685; *County Court of Roane County v. O'Brien,* 95 W. Va. 32, 122 S. E. 352; *Johnson v. City of Muskogee,* 194 Okla. 513, 153 P. (2d) 118; *Reid v. City of Muskogee,* 137 Okla. 44, 278 P. 339; *Palmer v. City of Liberal,* 334 Mo. 266, 64 S. W. (2d) 265; *Balducci v. Strough,* 239 N. Y. S. 611, 135 Misc. Rep. 346.

■ We are of the opinion that the Board of Directors of the "District" was authorized to purchase a part of the system of the "Cal-Pac" and was not obliged, under the authority vested in it by the voters, to acquire a system adequate to serve substantially all of the users of electricity in the "District." *Wheeler v. City and County of Denver,* 231 Fed. 8, 229 U. S. 342, 57 L. ed. 1219, 33 S. Ct. 842; *Missouri Service Company v. City of Stanberry,* 341 Mo. 500, 108 S. W. (2d) 25; *County Court of Roane County v. O'Brien,* supra.

Defendants rely on *Beers v. City of Watertown*, 43 S. D. 14, 177 N. W. 502. In the Beers case, the voters authorized the issuance of bonds under a Notice of Election and Ballot stating that the bonds would be used "* * * for the purpose of constructing * * * or purchasing a system of electric lighting for the purpose of providing light, heat and power for municipal, industrial and domestic purposes." It was admitted on demurrer that the contemplated system was "* * * only to furnish electricity for municipal purposes and water pumping," and was a radical departure from the purpose stated in the "Notice" and "Ballot," namely, to furnish electricity for three distinct purposes. Obviously, that case is clearly distinguishable in view of the material difference in the purposes stated in the "Notice" and "Ballot" from that involved herein. We see no need of reviewing many of the cases cited involving notices and ballots materially different from the "Notice" and "Ballots" in the instant suits.

If the Board was authorized to apply the bond money to purchase a unit of the system, we fail to see how its proposed use of such funds could be transformed into an unlawful diversion by reason of a plan to secure electric service for the rural part of the "District" through the aid of the "Cooperative" and the "R. E. A."

The "District" had no definite plan of acquiring an electric system in 1942 when the election was held. It may be that the Board hoped to acquire a complete system with the funds ($925,000.00) to be derived from the sale of the bonds. However, under conditions brought about by the war, it was difficult for the "District" to function. There was much delay oc-

casioned by extended negotiations and the considera-
tion of various proposals. In 1946 great economic
changes had occurred but the Board, in the exercise
of its broad discretionary powers, (*Board of Directors
of Northern Wasco County P. U. D. v. Kelly,* 171 Or.
691, 137 P. (2d) 295) no doubt endeavored to bring
electric service to as many people in the "District"
as possible. The "District" could not purchase the
entire system of "Cal-Pac," so undertook to acquire
the first unit thereof.

We are not unmindful that the corporate limits of
La Grande constitute only a small part of the area
of the "District." That municipality, however, has
more than one half of the electricity users in the county
and produces more than 63 per cent of the gross
revenues. There is nothing inequitable or unjust about
the action of the Board of Directors in the application
of the bond money. The revenue bonds are not general
obligations of the "District." The bonds are payable
solely from the revenues derived from the sale of
electric energy. It may be that the acquisition of the
first unit—if such occurs—may eventually inure to
the benefit of the people in the rural sections who need
electric service.

■ ■ We are convinced that the "District," in
executing the "Operating Agreement" with the "Co-
operative," was acting beyond its statutory authority
and in violation of the purpose and spirit of the "Peo-
ples' Utility District Law." The Board of Directors
of the "District" are elected by the people to manage
the business of the "District." The Board is vested
with authority (§ 114-233, O. C. L. A.) to "* * * super-
vise and regulate every utility owned and/or *operated
by such district,* including the *fixing and adjusting of*

*rates.''* True, the ''District'' has authority to contract, but can it thus surrender or abdicate authority conferred upon it by the legislature? We think it cannot. As stated in 1 McQuillin on Municipal Corporation, 2d Ed. Revised, § 393: ''* * * the principle is fundamental and of universal application that public powers conferred upon a municipal corporation and its officers and agents cannot be surrendered or delegated to others,'' citing numerous authorities in support of the text.

Turning to the ''Operating Agreement'' we find, among other things, that: (1) The system is to be operated by the ''District'' ''* * * for the account and risk of the Cooperative, and subject to its direction * * *; (2) The ''District'' must operate the system acquired by the ''Cooperative'' in accordance with standards of operation and maintenance established by the ''R. E. A.,'' and ''* * * in accordance with all applicable laws, rules, regulations, franchises, licenses and permits of all governmental bodies having jurisdiction in the premises''; (3) The appointment by the ''District'' of any manager, superintendent, or other employee in charge of the operation of the system is subject to the ''consent'' of the ''Cooperative'' and the ''R. E. A.''; (4) The ''District'' is granted an option to purchase an electric system from the ''Cooperative'' and, in the event such right is exercised, it is provided that the ''District'' shall assume all obligations and indebtedness of the ''Cooperative'' with the ''R. E. A.''; (5) The ''District'' and the ''Cooperative,'' by strong implication, grant to the ''R. E. A.'' the right to fix and determine rates.

We are in accord with the view of the circuit court in reference to this ''Operating Agreement.'' It is a

complete surrender or abdication by the "District" of statutory authority. It was not contemplated by the "Peoples' Utility District Law" that the "District" could thus transfer the management, responsibility and control over an electric system, even though the system is not owned by it. *Seafeldt v. Port of Astoria,* 141 Or. 418, 16 P. (2d) 943 does not support the contention of the appellants on this phase of the case. We conclude that this "Agreement" is invalid and that the "District" should be enjoined from acting thereunder.

■ It does not follow, however, that by reason of the invalidity of the "Operating Agreement," the "District" should be precluded from using bond money to purchase the part of the electric system owned by "Cal-Pac" in Union county. It is not believed that the acquisition by the "District" and the "Cooperative" of their respective interests in the electric system is conditioned upon the existence of the "Operating Agreement." The "Operating Agreement" is primarily for the purpose of economy. It was entirely possible that the "District" and the "Cooperative" could have operated their respective systems independently of one another.

From what has been said, it must not be considered that this court is determining the contractual obligations or duties of the "Cal-Pac" under the sale agreement entered into by it with the "District" and the "Cooperative" for reasons heretofore stated. The "Cooperative" is made a defendant only in the Stringham et al. suit. The "R. E. A." is not a party in any of the suits. In view of this state of the record, the decision of this court will be limited, as there can be no adjudication of the rights of parties over which we have no jurisdiction. It is the decree of this court: (1) That the proposed use of the bond money to pur-

chase a part of an electric system owned by "Cal-Pac" in Union county does not constitute an unlawful diversion of funds. (2) That the "Operating Agreement" executed by the "District" and the "Cooperative" is invalid.

In the Stringham et al. suit, it was decreed:

"1. That the plan and program of the defendants as more particularly referred to in said Findings of Fact and Conclusions of Law are contrary to law and public policy.

"2. The contracts and ordinances so herein referred to, particularly the sale agreement of June 11, 1946, between the District, the Cooperative and California-Pacific Utilities Company, the allocation of property agreement of June 27, 1946, between the District and the Cooperative, the operating agreement of June 27, 1946, between the District and the Cooperative, and Ordinance No. 2 of the District dated May 20, 1946, and Ordinance No. 3 of the District dated July 1, 1946, are as to all of the parties hereto illegal and void, and may not be employed or depended upon to accomplish the said plan and program.

"3. The District may not sell any of the bonds authorized at the election held November 3rd, 1942, and purchase with the money to be derived from such sale that portion only of the system under the plan and program contemplated and established by the record and referred to in said Findings of Fact and Conclusions of Law.

"4. The proceeds from any sale of said bonds may be spent only for the purchase or construction of a substantially complete electric system for said District and not for a part only of such system."

The decree in Conley et al. is substantially the same as that rendered in the Stringham et al. suit. That part of the above decrees holding the "Operating

Agreement" invalid is affirmed, but the decrees in all other particulars are reversed.

The decree in Hermann et al. provides:

"1. The plan and proposal of the District to purchase from the proceeds of the bond issue authorized by the voters on November 3rd, 1942, electric plant and facilities sufficient to serve only that portion of the city of La Grande embraced within its corporate limits constitutes an abandonment of the original plan as submitted to and as approved by the voters.

"2. The aforesaid Ordinance No. 2, approved May 20, 1946, in so far as it purports to provide for the purchase only of the said properties in La Grande, and at Morgan Lake and Cove, and the aforesaid Ordinance No. 3, approved July 1, 1946, purporting to award said bonds to Messrs. Ballard-Hassett Company, are illegal and void.

"3. Such plan is unauthorized and illegal, and the defendants, and each and all of them, their agents, servants and employees, and all persons acting by, under and through them, or any of them, are hereby enjoined and restrained from selling all or any portion of said bonds, or using any funds derived from the sale thereof for carrying out such plan or purpose, or from putting said plan and proposal into operation, and from attempting to do so."

The decree in the Hermann et al. suit is reversed in its entirety.

The causes are remanded with directions to proceed in accordance with this opinion. Defendants are entitled to costs and disbursements.