Argued May 6; affirmed June 22, 1948

# GURDANE ET AL. *v.* NORTHERN WASCO COUNTY PEOPLES' UTILITY DISTRICT

195 P. (2d) 171

*A. A. Smith* and *Francis F. Hill,* of Portland, argued the cause for appellants. On the brief were Laing, Gray & Smith, of Portland, and Gavin & Gavin, of The Dalles.

*Gus J. Solomon,* of Portland, argued the cause for respondents. With him on the brief were Donald E. Heisler, of The Dalles, and Raymond M. Kell, of Portland.

Before ROSSMAN, Chief Justice, and LUSK, KELLY, BAILEY and BRAND, Justices.

BAILEY, J.

This suit was brought by Tom B. Gurdane, Pa-

cific Power & Light Company, a corporation, and others, as plaintiffs, against Northern Wasco County Peoples' Utility District, a quasi-municipal corporation, and its directors and officers, as defendants, to enjoin the defendants from selling or attempting to sell revenue bonds of the Utility District. From a decree in favor of the defendants, plaintiffs have appealed.

On March 3, 1938, there was filed with the State Hydroelectric Commission a voters' preliminary petition asking the Commission to investigate the feasibility of creating a peoples' utility district to be known as the Northern Wasco County Peoples' Utility District. The Commission, on August 5th of that year, issued its preliminary report in which it found the proposed district feasible. At an election held on November 8, 1938, the vote was against the creation of a district. A second election was held on August 15, 1939, at which the vote was favorable, and on August 22, 1939, the Hydroelectric Commission issued a formal proclamation declaring that the Utility District had been duly and regularly incorporated. At an election held on November 5, 1940, the voters of the Utility District authorized the board of directors thereof "to issue and sell revenue bonds of said District in the amount of $475,000.00 * * * for the purpose of acquiring, either by purchase and construction, or by construction, plant, works, and other property for the development, transmission, and distribution of electric energy within, or partly within and partly without the limits of said District, such bonds to be payable solely from revenues derived from the sale of electric energy, or any other service furnished in connection therewith, after paying all expenses of operation and maintenance, including taxes".

On or about August 12, 1941, a suit was brought by the board of directors of the Utility District to secure a decree confirming the regularity and legality of the proceedings in connection with the creation of the Utility District and the issue and sale of revenue bonds of the District in the amount of $475,000. The Circuit Court entered a decree declaring that all proceedings in connection with the creation of the District and the issue and sale of said bonds were regular and legal and such proceedings were "approved and confirmed". This decree was affirmed by the Supreme Court on June 29, 1943. *Board of Directors of Northern Wasco County Peoples' Utility District v. Kelly, et al.,* 171 Or. 691, 137 P. (2d) 295. Thereafter, the officials of Dalles City refused to accept and file a petition requesting that there be submitted to the legal voters of Dalles City, for their approval or rejection, a proposed initiative ordinance granting to the Utility District a 20-year franchise, and on July 23, 1945, a mandamus proceeding was filed by W. J. Seufert and the Utility District against the city officials to compel them to file the petition and to call an election. The Circuit Court ordered that a peremptory writ issue against the defendants. From that order the defendants appealed and it was affirmed by this court on April 9, 1946. *Seufert v. Stadelman,* 178 Or. 646, 167 P. (2d) 936. The voters of Dalles City granted the Utility District a 20-year franchise on May 17, 1946.

The Utility District, on December 3, 1946, adopted an ordinance which provided, among other things, that "there shall be presently issued Electric Revenue Bonds of said District, as hereinbefore authorized, to the aggregate principal amount of $225,000.00," for the purpose of constructing "the first unit of the electric utility properties of said District, consisting

of electric transmission and distribution facilities within and adjacent to" Dalles City. This suit was immediately instituted to prevent the issuance and sale of these bonds.

The plaintiffs assign as error the entry of a decree in favor of defendants. This assignment is discussed under the following three propositions:

"I. A district may not submit a proposed bond issue without having a general plan by which the purpose stated in the ballot is to be accomplished, or thereafter abandon such plan in favor of a materially different one.

"II. Construction of a utility system adequate to serve the people of the district will cost substantially more than the authorized bond issue.

"III. The great economic changes occurring since 1940 have deprived the bond election of significance, and in such circumstances the issuance of such bonds would now be inequitable."

Plaintiff Pacific Power & Light Company is a corporation engaged in the operation of an electric system in Wasco County, Oregon, and in other sections of the states of Oregon and Washington. It furnishes Dalles City and its inhabitants and the inhabitants of the rural districts in Wasco County with electric light and power. The individual plaintiffs are taxpayers and voters of the Utility District. Defendant Northern Wasco County Peoples' Utility District is a quasi-municipal corporation. Its boundaries include Dalles City and an unincorporated parcel of territory adjacent thereto.

The gravamen of plaintiffs' amended complaint is that during the period preceding the bond election in November, 1940, the District waged a vigorous and

extensive campaign in support of such proposed bond issue, in which campaign ''it publicly represented and declared to the voters, both orally and in written and printed form, that said proposed bond issue was more than sufficient to provide the people of said District with an electric utility system serving all or substantially all of the area embraced within the boundaries of said District''; that since the authorization of said bond issue in 1940 ''costs of constructing electric transmission and distribution facilities have greatly increased; there has been a large increase in the population of the District necessitating substantial increase in the facilities required to serve such increased population''; that by reason of such changes in circumstances and conditions the $475,000 in bonds authorized by the District ''is now wholly inadequate to finance the construction of a system capable of serving said District or to purchase the properties of Pacific Power & Light Company now serving said District, all of which facts are well known to the directors of said District''; that ''said District, if permitted to carry out its present plan as proposed in said bond ordinance of December 3, 1946, will dissipate all of said authorized bond issue in piecemeal construction, leaving large areas of said District wholly unserved which, as authorized by the voters upon the submission to them of $475,000 bond proposal, were to be fully and adequately served by a system of said District to be financed by proceeds of said bond issue''; and that in such circumstances the issuance and sale of said bonds at this time constitutes ''an abuse of discretion upon the part of said directors and a fraud upon the voters of said District''.

Plaintiffs introduced considerable evidence, much of it over the ruling of the trial court that it was inadmissible, in an attempt to establish their claim that

representations were made by the district to the voters thereof that $475,000 was "more than sufficient" to serve "all or substantially all of the area embraced within the boundaries of said district." This evidence was excluded because the Circuit Court found no ambiguity in either the resolution calling the bond election or the ballot title for such election and therefore was of the opinion that evidence was inadmissible to vary the terms of such resolution or ballot title. However, in reaching its conclusion that court "considered all of such testimony, and from such consideration fails to find even a scintilla of evidence tending to establish any material representations to the voters of the district other than those contained in the resolution and ballot title."

The questions presented on this appeal are very similar to those decided in *Conley et al. v. Union County Peoples' Utility District*, 182 Or. 565, 187 P. (2d) 150. In the present case the wording of the resolution calling the bond election, of the notice of election, and of the ballot title, with the exception of the name of the Utility District and the amount of the bond issue, is almost identical with the wording of those in the Conley case. We there held that the language used in the notice of election and in the official ballot title was clear and unambiguous, that evidence "about pre-election advertisements, propaganda, and statements of certain officials, acting in an individual capacity, as to what was contemplated by the voters in this bond election," was inadmissible, and that evidence of that character could not "be considered to vary or modify the language" of the notice of election or official ballot. That ruling is also applicable to this case. Moreover we fail to find any substantial evidence "tending to establish any material representations to the voters of

the district other than those contained" in the resolution, notice of election, and ballot title.

It was stated in the Conley case that the District "had no definite plan of acquiring an electric system in 1942 when the [bond] election was held. It may be that the Board hoped to acquire a complete system with the funds ($925,000.00) to be derived from the sale of the bonds. However, under conditions brought about by the war, it was difficult for the 'District' to function." In a petition for rehearing in that case the foregoing excerpt was challenged and it was there contended, based principally upon the authority of *Medford Irrigation District v. Hill,* 96 Or. 649, 190 P. 957, that before a utility district could submit a bond issue to the voters of the district it was necessary for the board of directors to have a general plan. That petition was denied without a written opinion. Assuming that the petition was denied because the questions therein discussed "were not properly before the court for decision", plaintiffs assert that, under the ruling in the Hill case, a utility district must have a general plan for acquiring or constructing an electric system before submitting a bond issue therefor to the voters for their approval or rejection. They claim, however, that the Utility District here involved had a general plan and that under such plan the program of the District "was to be accomplished either by construction of a system as outlined in the Hydroelectric Commission Report, or by purchase and extension of the existing Pacific Power & Light Company system within the area as shown in the official minutes of the board of directors of the district, both before and immediately after the bond election."

In the Hill case the Medford Irrigation District, as originally created, comprised approximately 18,500

acres of land. After its organization "the board of directors met and adopted a project, designated as the 'Big Butte Project,' for the obtaining of water to irrigate the district, and directed that bonds should be issued in the sum of fifteen hundred thousand ($1,500,000) dollars, for the construction and installation of a system for irrigating the district, * * *." At the election the result was favorable to the issuance of the bonds. That case was brought "to confirm the proceedings before the County Court, the action of the board of directors, and the proposed sale of bonds." Before the final decision upon the confirmation proceedings the directors concluded that the original project, designated as the "Big Butte Project" was not feasible and "rescinded the order adopting that project, and adopted an entirely different one," which was known as the "Little Butte Project". It was conceded that the Little Butte Project would not furnish sufficient water to irrigate the entire 18,500 acres and the directors permitted those who were contesting the confirmation proceedings to have their lands, amounting to over 8,000 acres, eliminated from the district. At the time the bonds were authorized the estimated cost of the project was $75 per acre. With the district reduced to 10,000 acres the estimated cost of the project was $1,250,000 or approximately $125 per acre.

In order to understand the holding in the Hill case, it is necessary to refer to some of the statutory provisions relating to irrigation districts. Section 6182, L. O. L., as amended by § 7 of chapter 223, General Laws of Oregon, 1911, provided that upon the organization of an irrigation district, the directors thereof should formulate "a general plan of its proposed works, in which it shall state in a general way what works * * * it proposes to construct, and the estimated cost

for carrying out said plan  *  *  *." It further provided that the "surveys, examinations, maps, plans and estimates, shall be made under the direction of a competent irrigation engineer" to be employed by the board of directors, and that copies thereof should be submitted to the state engineer who was required within 90 days after receipt thereof to file a report "upon the same with the said board," and that upon "receiving said report said board of directors shall proceed to determine the amount of money necessary to be raised  *  *  *  and shall immediately thereafter call a special election, at which shall be submitted to the electors of said district, the question whether or not the bonds of said district  *  *  *  shall be authorized."

In 1917 a new irrigation code was enacted, Ch. 357, Laws, 1917, and the section above referred to was repealed. Sections 15 and 19 of the 1917 enactment are in part as follows:

> Section 15. "Before beginning the construction of any irrigation or other works the board of directors shall cause surveys, plans and specifications to be prepared, and for this purpose shall appoint a competent irrigation engineer, or said board may secure and adopt in whole or in part any surveys, plans and specifications which may have been made or prepared. The plans and specifications, when completed or adopted by the board, shall be submitted to the State Engineer for his approval, together with a general report showing the feasibility of the project and an estimate of the cost of the works  *  *  *."

> Section 19. "Upon order of the directors duly entered an election shall be held to determine whether bonds in any amount the board may deem necessary shall be issued for any purpose necessary or convenient in carrying out the provisions of this Act  *  *  *."

The court, after quoting the foregoing excerpt from § 19, said:

"We think the words 'for any purpose,' italicized above, together with the clauses following, indicate an intention upon the part of the legislature, that there should be some general plan or purpose adopted for the bringing in of water before a bond election, which purpose should be expressed in the order of the directors authorizing the election, and upon which the land owners can vote intelligently as to whether or not the bonds for that purpose shall be issued.

"If this were not true, bonds could be issued and sold without any project whatever having been selected or being in view, and upon the mere chance that some feasible proposition for obtaining water could be discovered and decided upon at some time in the future.

"We do not think an act of this kind, authorizing the burdening of large agricultural districts with great sums of indebtedness, approximating the entire value of the lands in the district, and to be enforced oftentimes against the will of a portion of the land owners, should be so loosely construed. Such enterprises are full of risk and danger at the best, and must necessarily be disastrous to the entire district if they fail."

It was further stated by the court in the Hill case that it saw nothing in the change from the language of the 1911 act to that of the 1917 act to indicate an intention on the part of the legislature

" * * * to authorize the directors to call a bond election, without adopting any plan or project for the bringing in of water. On the contrary, we think that, while the language of the act of 1911 was more explicit in that regard than the language of the later act, yet the later act, when fairly construed, still provides that the bond election must only be called with reference to some general purpose or

project, and cannot be left entirely up in the air, with power to the district to issue and sell bonds, without reference to any purpose or plans and without ascertaining whether there is any source from which water for irrigation can be obtained. If any such a revolutionary change had been intended by the legislature, we think it would have indicated it in plain words, and the fact that it did not say so, but, on the contrary limited such authorization of bonds to 'any purpose' selected by the order of the directors, makes some definite purpose just as necessary to the issuance of bonds as it was under the old act.''

■ We have discussed the Hill case and different statutory provisions relating to irrigation district bonds at some length for the reason that plaintiffs place much reliance on that case in support of their contention that a utility district ''may not submit a proposed bond issue without having a general plan by which the purpose stated in the ballot is to be accomplished, or thereafter abandon such plan in favor of a materially different one.'' The provisions of the Irrigation Code referable to the adoption of plans and the issuance of bonds are much more definite and specific than are those of the Utility District Act.

Section 114-255, O. C. L. A., which authorizes the issuance of bonds by utility districts, provides: ''For the purpose of carrying into effect the power herein granted, any district, when authorized by a majority of the qualified voters of such district  *  *  *  may issue and sell revenue bonds  *  *  *; and with like authorization any district may issue and sell general obligation bonds  *  *  *.'' It is argued by plaintiffs that since the wording of the last above-quoted excerpt is similar to that of § 19 of the 1917 Irrigation Code hereinbefore quoted, the court should place the same construction on

the Utility District Act relative to the issuance of bonds and the use of the proceeds thereof as was placed by the court in the Hill case on the issuance and sale of bonds under the Irrigation Code. But such argument overlooks the fact that other provisions of the Irrigation Code formed the basis of the decision. The ruling in the Hill case can have little, if any, application here because of the material difference in the two acts.

At the time of the bond election the Utility District did not know whether it would purchase the existing electric system of the Pacific Power & Light Company or construct its own system. If it constructed its own system then, in all probability, it would not build the entire system at once. The report of the Hydroelectric Commission, filed in 1938 respecting the feasibility of creating a proposed utility district and estimating the cost of an electric utility system to serve such district, was not, as is contended by the plaintiffs, adopted by the District as its plan for the construction of an electric system in the event it was unsuccessful in its negotiation for the purchase of the existing electric system. The primary purpose of that report was to determine whether the creation of the proposed district was justified, not what it might cost to construct an electric utility system.

◼ The bond proposition was submitted in broad and general terms. We have hereinbefore quoted the ballot title. It referred to no definite or general plan; neither did the resolution calling the election nor the notice of election. The resolution recites that the District "desires to acquire a utility system for the distribution and sale of electric energy within or partly within and partly without the territory of such District; and * * * the Board of Directors of the District finds that the approximate cost of the acquisition of the utility system

for the development, transmission and distribution of electric energy for the purpose of said District is $475,000.00''.

In *Sacramento Municipality Utility District v. All Parties and Persons,* 6 Cal. (2d) 197, 57 P. (2d) 506, it was contended that the provisions of the proposition calling for the bond issue submitted ''an alternative and uncertain purpose'' for the expenditure of the proceeds of the bond issue. The ordinance calling the election and the ballots used by voters each set out the purpose as being ''the acquisition and construction by the said District of a certain revenue-producing municipal utility improvement, to wit: works, or parts of works, within or without, or partly within and partly without, said District for supplying the inhabitants of said District and any municipality therein with light, power and heat   *   *   *.'' The court, after expressing its disagreement with the foregoing contention, said:

    '' *   *   * The rule is that public bodies may submit bond propositions in broad and general terms. Such a body may make its order of submission 'just as broad, and just as narrow,' or just as specific as it is willing to be bound by. O'Farrell v. Sonoma County, 189 Cal. 343, 347, 208 P. 117. When the authorities having the power and responsibility of proposing the bond issue have not, by the forms employed in submitting the proposition to the electors, confined themselves to an absolutely definite and inflexible plan of construction and expenditure, and have proceeded, free from fraud and in good faith, in accordance with the program based upon estimated costs, no good reason appears why they should not be permitted to carry on the improvement to the extent of the funds available. Williams v. City of Stockton, 195 Cal. 743, 756, 235 P. 986. This language was used in construing the requirement of the act relating to incurring indebtedness by munic-

ipalities for municipal improvements (Stats. 1901, p. 27), which provides (section 2) that in submitting the proposition to the electors the ordinance shall recite 'the estimated cost of the proposed public improvements.' The Public Utilities Act we are considering requires (section 15) that the ordinance shall recite 'the estimated cost of the utility, works * * * to be acquired, constructed or completed.' The proposition as submitted to the electors satisfied all legal requirements.''

Before passing the ordinance of December 3, 1946, for the sale of $225,000 of bonds, the directors of the District had reports of studies made by, and the advice of, the Bonneville Power Administration engineers and the manager of the Utility District, and the advice of the State Hydroelectric engineer and of bond buyers, as to the cost and feasibility of the construction of the first unit of the electric system which the district proposed to construct with the proceeds of the $225,000 bond issue. The directors found that it was proper and advisable to construct the first unit, which was to consist ''of electric transmission and distribution facilities within and adjacent'' to Dalles City, and passed the ordinance.

■ Approximately 85 per cent of the District's potential customers live in Dalles City and the adjoining districts of Chenowith and Thompson's Addition. We think that the weight of the evidence establishes the fact that an electric system which would serve substantially 85 to 90 per cent of the potential customers of the District could be constructed for $475,000. Plaintiffs contend, and the evidence supports their contention, that $475,000 is insufficient to construct a system which will provide service for ''all or substantially all of the area embraced within the boundaries of said District''. They assume that the District, in submitting

the bond issue to the voters, undertook to provide an electric system which would serve substantially all of the *area* within the District. But there is nothing in the ballot title nor in the resolution calling the election to justify such an assumption. Probably the directors, in submitting the bond issue to the electorate, were of the opinion that the amount thereof would be sufficient to provide electric energy to substantially all of the potential customers within the District who could be served at a reasonable profit. The amount of the bond issue was only an estimate of the cost of an electric system. "It is rather the exception than the rule that public improvements are built within the limit of the amount of money appropriated therefor." *Wheeler v. City and County of Denver*, 231 F. 8.

■ In *Dougan Co. v. Klamath County,* 99 Or. 436, 457, 193 P. 645, the court quotes with approval from *Avery v. Job,* 25 Or. 512, 36 P. 293, as follows:

"No principle of equity jurisprudence is, perhaps, better established than that when the officers of a municipal corporation are clothed with a discretionary power, and are acting within the scope of such power, a court of equity will not sit in review of their proceedings, or interfere by injunction, at the suit of a private citizen, unless fraud is shown, or the power or discretion is being manifestly abused to the oppression of the citizen. The fact that the court would have exercised the discretion in a different manner will not warrant it in interfering. * * *

"Now, in this case the matter of erecting or purchasing waterworks is, by the charter of Corvallis, committed to the judgment and discretion of the council, and whether they act wisely or unwisely in so doing, it is not the province of a court of equity to interfere, so long as they exercise such judgment or discretion in good faith; * * *"

■ The evidence clearly demonstrates that the directors acted in good faith in passing the ordinance of December 3, 1946. There is no evidence of any fraudulent conduct on their part. Whether to proceed at this time to construct the first unit of the system is committed to the judgment and discretion of the board of directors. *Conley v. Union County Peoples' Utility District*, supra.

■ It is argued by plaintiffs that, because of great economic changes occurring since 1940 when the bond issue was authorized by the electorate "it would be an abuse of discretion and a fraud upon the voters of the district for the directors to embark upon the program proposed in the bond ordinance of December 3, 1946". For numerous reasons there was delay in the construction of an electric system by the Utility District. Much of the delay was caused by litigation. Before offering the bonds for sale it was deemed advisable, and probably necessary, to have a decree of the court validating the organization of the district and the authorization of the bonds. That litigation, because of an appeal to this court by the defendants, extended over a period of approximately two years and did not end until June, 1943. Before constructing a system to serve the inhabitants of Dalles City it was necessary to procure a franchise to operate within the limits of that city. Additional litigation was involved in obtaining such franchise. The present suit was instituted January 2, 1947. Construction of a system during World War II was almost impossible.

The following quotation from *Missouri Electric Power Co. v. Smith,* 348 Mo. 738, 751, 155 S. W. (2d) 113, involving a delay of nine years, is pertinent to the question under consideration:

"Whether a delay is reasonable or unreasonable

depends upon the facts and circumstances in evidence. No other cause for the delay is shown by the evidence, other than the continuous litigation mentioned, supra. No intent to abandon is shown and, accordingly, we may infer and find in accordance with the terms of the ordinance that the delay was due to the litigation. \* \* \* If a mere delay due to pending litigation could thwart the will of the voters and withdraw the authority given to the city officers to proceed with the mandate of the people for a municipally owned electric light plant, then a way would have been found to effectively prevent such an improvement. In addition, in view of the history of such matters in this State, the voters could reasonably have assumed that the matter might be greatly delayed by litigation, and a considerable time elapse between the date of the election and the sale of bonds or the construction of the plant.''

The delay in this case was unavoidable so far as the directors were concerned. They have been diligent in their attempt to acquire either by purchase or by construction an electric system for the District. Although great economic changes have occurred since 1940, nevertheless we do not think that ''it would be an abuse of discretion and a fraud upon the voters of the district for the directors to embark upon the program proposed in the bond ordinance of December 3, 1946.'' *Conley v. Union County Peoples' Utility District,* supra. The one and practically only object of the organization of the Utility District is to supply electric energy within or partly within and partly without the limits of the District, and the court should not, on the record in this case, enjoin it from carrying out its functions.

We find no error in the decree of the Circuit Court. It is therefore affirmed.